No. 23-60255

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; TEXAS ASSOCIATION OF BUSINESS,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

Petition for Review of an Order of
the Securities and Exchange Commission
Release Nos. 34-97424; IC-34906

## OPENING BRIEF OF PETITIONERS

Tara S. Morrissey
Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER
LITIGATION CENTER
1615 H Street, N.W.
Washington, DC 20062
(202) 463-5337

Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Charles E.T. Roberts
Ryan M. Proctor
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

Alexander V. Maugeri
JONES DAY
250 Vesey St.
New York, NY 10281
(212) 326-3939

*Counsel for Petitioners*

## CERTIFICATE OF INTERESTED PERSONS

### No. 23-60255, Chamber of Commerce of the United States of America et al. v. United States Securities and Exchange Commission

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.      Petitioner **Chamber of Commerce of the United States of America** has no parent corporation and no publicly held corporation owns 10% or more of its stock.

2.      Petitioner **Longview Chamber of Commerce** has no parent corporation and no publicly held corporation owns 10% or more of its stock.

3.      Petitioner **Texas Association of Business** has no parent corporation and no publicly held corporation owns 10% or more of its stock.

4.      The following law firms and counsel have participated in the case:

i

**Petitioners**

Chamber of Commerce of the United States of America;
Longview Chamber of Commerce;
Texas Association of Business

**Petitioners' Counsel**

Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Charles E.T. Roberts
Ryan M. Proctor
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001

Alexander V. Maugeri
JONES DAY
250 Vesey St.
New York, NY 10281

Tara S. Morrissey
Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, DC 20062

**Respondent**

United States Securities and Exchange Commission

**Respondent's Counsel**

Theodore Weiman
Joseph Freda
Dominick V. Hill
Ezekiel Levenson

*/s/ Noel J. Francisco*

Noel J. Francisco
*Counsel for Petitioners*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would assist this Court. This case raises important questions about the constitutionality of compelled speech under the Free Speech Clause. More generally, oral argument would assist this Court in addressing substantive and remedial questions under the Administrative Procedure Act (APA) concerning a significant rule.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................iii

TABLE OF AUTHORITIES....................................................................vi

INTRODUCTION.................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 4

STATEMENT OF THE ISSUES............................................................. 5

STATEMENT OF THE CASE ................................................................ 6

    A.    Stock Buybacks ......................................................... 6

    B.    Manufacturing Controversy Around Buybacks..................... 8

    C.    The SEC's 2020 Staff Study.................................. 10

    D.    The Proposed Rule ................................................ 12

    E.    The Comment Process........................................... 14

    F.    The Final Rule....................................................... 16

    G.    This Litigation....................................................... 16

SUMMARY OF THE ARGUMENT ...................................................... 17

STANDARD OF REVIEW..................................................................... 20

ARGUMENT ......................................................................................... 21

I.    THE FIRST AMENDMENT REQUIRES SETTING ASIDE THE RATIONALE-DISCLOSURE AND DAILY-DATA REQUIREMENTS.......................................................................... 21

    A.    The Rationale-Disclosure Requirement Contravenes The First Amendment.......................................... 21

        1.    No exception to strict scrutiny applies. ...................... 23

        2.    The requirement fails any degree of First Amendment review. .................................. 29

# TABLE OF CONTENTS
(continued)

**Page**

B.     Given This Constitutional Defect, The Daily-Disclosure Requirement Must Be Set Aside As Well. ............................ 34

II.    THE COMMISSION FAILED TO ENGAGE IN REASONED DECISIONMAKING ...................................................................... 37

       A.     The Commission Did Not Reasonably Explain Its Failure to Quantify the Rule's Economic Effects. ...... 39

       B.     The Commission Did Not Adequately Justify the Rule's Purported Benefits. .......................................... 42

       C.     The Commission Did Not Adequately Assess the Effect of the Recently Enacted Excise Tax on the Rule. ........................................................................... 54

       D.     The Commission Did Not Reasonably Determine the Rule's Overall Effect. ........................................... 58

III.   PETITIONERS LACKED A MEANINGFUL OPPORTUNITY TO COMMENT. ................................................ 61

CONCLUSION ...................................................................................... 67

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*303 Creative LLC v. Elenis*,
No. 21-476, slip op. (U.S. June 30, 2023) ........................................... 20

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) ............................................................................... 25

*Am. Beverage Ass'n v. San Francisco*,
916 F.3d 749 (9th Cir. 2019) (en banc) ........................................ 22, 23

*Am. Equity Inv. Life Ins. Co. v. SEC*,
613 F.3d 166 (D.C. Cir. 2010) ....................................................... 41, 49

*Am. Meat Inst. v. USDA* (*AMI*),
760 F.3d 18 (D.C. Cir. 2014) (en banc) .................................. 21, 24, 27

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) .................................................. *passim*

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ................................................................ 22

*Cath. Legal Immigr. Network, Inc. v. EOIR*,
No. 21-cv-94, 2021 WL 3609986 (D.D.C. Apr. 4, 2021) ............... 59, 60

*Central Hudson Gas & Elec. Corp. v. Pub. Ser. Comm'n*,
447 U.S. 557 (1980) ....................................................................... 24, 30

*Centro Legal De La Raza v. EOIR*,
524 F. Supp. 3d 919 (N.D. Cal. 2021) ................................................ 56

*Chadbourne & Parke LLP v. Troice*,
571 U.S. 377 (2014) ............................................................................... 9

*Chamber of Com. of U.S. v. DOL*,
885 F.3d 360 (5th Cir. 2018) ............................................................... 44

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chamber of Com. of U.S. v. SEC,*
412 F.3d 133 (D.C. Cir. 2005) ..................................................... *passim*

*Disc. Tobacco City & Lottery, Inc. v. United States,*
674 F.3d 509 (6th Cir. 2012) ......................................................... 21, 24

*Eastman Chem. Co. v. Plastipure, Inc.,*
775 F.3d 230 (5th Cir. 2014) ............................................................... 25

*Free Enter. Fund v. PCAOB,*
537 F.3d 667 (D.C. Cir. 2008) ........................................................... 26

*Horsehead Res. Dev. Co. v. EPA,*
130 F.3d 1090 (D.C. Cir. 1997) ......................................................... 15

*Huawei Techs. USA, Inc. v. FCC,*
2 F.4th 421 (5th Cir. 2021) .......................................................... 37, 50

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
515 U.S. 557 (1995) ................................................................. 19, 21, 28

*Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.,*
512 U.S. 136 (1994) ........................................................................... 26

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
60 F.4th 956 (5th Cir. 2023) ............................................................. 38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
*Ins. Co.,* 463 U.S. 29 (1983) ...................................................... *passim*

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
142 S. Ct. 2111 (2022) ...................................................................... 20

*Nat'l Ass'n of Mfrs. v. SEC,*
800 F.3d 518 (D.C. Cir. 2015) ................................................. 22, 25, 28

*Nat'l Lifeline Ass'n v. FCC,*
921 F.3d 1102 (D.C. Cir. 2019) ..................................................... 50, 55

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*NIFLA v. Becerra,*
  138 S. Ct. 2361 (2018) .................................................................. *passim*

*OCA-Greater Houston v. Texas,*
  867 F.3d 604 (5th Cir. 2017) .................................................. 4

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n,*
  475 U.S. 1 (1986) .................................................................... 19

*Pangea Leg. Servs. v. DHS,*
  501 F. Supp. 3d 792 (N.D. Cal. 2020) .................................. 59

*Portland Cement Ass'n v. EPA,*
  665 F.3d 177 (D.C. Cir. 2011) .................................. 42, 49, 52

*Prometheus Radio Project v. FCC,*
  652 F.3d 431 (3d Cir. 2011) ................................................ 55

*Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.,*
  632 F.3d 212 (5th Cir. 2011) ........................................ 21, 30

*Riley v. Nat'l Fed'n of the Blind,*
  487 U.S. 781 (1988) .............................................................. 25

*Rural Cellular Ass'n v. FCC,*
  588 F.3d 1095 (D.C. Cir. 2009) .......................................... 55

*Serafine v. Branaman,*
  810 F.3d 354 (5th Cir. 2016) .............................................. 24

*Steel Mfrs. Ass'n v. EPA,*
  27 F.3d 642 (D.C. Cir. 1994) .............................................. 32

*Tex. Clinical Labs, Inc. v. Sebelius,*
  612 F.3d 771 (5th Cir. 2010) .............................................. 18

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976) .............................................................. 45

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Twin Rivers Paper Co. LLC v. SEC*,
934 F.3d 607 (D.C. Cir. 2019) ............................................................... 4

*United States v. Johnson*,
632 F.3d 912 (5th Cir. 2011) ................................................................ 32

*Wild Fish Conservancy v. Salazar*,
628 F.3d 513 (9th Cir. 2010) ................................................................ 32

*Wooley v. Maynard*,
430 U.S. 705 (1977) ............................................................................. 19

*Zauderer v. Office of Disciplinary Counsel*,
471 U.S. 626 (1985) ....................................................................... 21, 26

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. amend. I ............................................................................. 19

5 U.S.C. § 553 ................................................................................ 18, 55

5 U.S.C. § 706 ...................................................................................... 18

15 U.S.C. § 78c ......................................................................... 33, 34, 38

15 U.S.C. §78w ............................................................................ *passim*

15 U.S.C. § 78r ..................................................................................... 11

15 U.S.C. § 80a-2 ..................................................................... 33, 34, 38

15 U.S.C. § 80a-42 ............................................................................ 4, 5

26 U.S.C. § 4501 .................................................................................. 13

Reward Work Act, H.R. 3355, 116th Cong. § 2 (2019) ........................... 8

**OTHER AUTHORITIES**

17 C.F.R. § 201.140 ............................................................................... 4

17 C.F.R. § 229.703 ............................................................................. 36

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

86 Fed. Reg. 7223 (Jan. 20, 2021) ............................................. 56

87 Fed. Reg. 8443 (Feb. 15, 2022) .................................... *passim*

87 Fed. Reg. 8686 (Feb. 15, 2022) ............................................ 41

87 Fed. Reg. 63,016 (Oct. 18, 2022)................................... 14, 58

87 Fed. Reg. 75,975 (Dec. 12, 2022) ........................................ 14

88 Fed. Reg. 36,002 (June 1, 2023) ............................................ 1

Alex Edmans, *Do Share Buybacks Really Destroy Long-Term Value?* Harv. L.S. Forum on Corp. Governance (Oct. 22, 2020)........................................................................................ 23

Alex Edmans, *Share Repurchases, Executive Pay and Investment* (2019)............................................................................................ 39

Exec. Order No. 12,866 .............................................................. 56

Exec. Order No. 13,258 .............................................................. 56

Exec. Order No. 13,563 .............................................................. 56

Federal Rule of Appellate Procedure 32 ................................... 63

Fifth Circuit Rule 32.1 ............................................................... 63

Fifth Circuit Rule 32.2 ............................................................... 63

J. Grossman & J. Stiglitz, *On the Impossibility of Informationally Efficient Markets*, 70 Am. Econ. Rev. 393 (1980)..................................................................................... 47, 48

H. Comm. on Appropriations, *Consolidated Appropriations Act, 2020*, H.R. 1158 (2020) ...................................... 9, 10, 11

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

House Appropriations Subcomm. on Fin. Servs, *Hearing on the Fiscal Year 2023 SEC and Federal Trade Commission Budget Request* (May 18, 2022) .......................................................... 57

*Insider Trading Arrangements and Related Disclosures*, 87 Fed. Reg. 80,362 (Dec. 29, 2022) .............................................. 41, 42

Robert Jackson, *Stock Buybacks and Corporate Cashouts* (June 11, 2018) ................................................................................ 9, 23

Letter of Sen. Tammy Baldwin et al. to Jay Clayton, Chair, SEC
(June 28, 2018) .................................................................................. 7

Comm'r Hester Peirce, *Rip Current Rulemakings: Statement on the Regulatory Flexibility Agenda* n. 25 (June 22, 2022) ............. 57

*President Biden's State of the Union Address*, White House (Feb. 7, 2023) ................................................................................... 8

*Promoting Economic Growth: A Review of Proposals to Strengthen the Rights and Protection of Workers: Hearing Before the House Subcommittee on Investor Protection Entrepreneurship, and Capital Markets* (May 15, 2019) ..................... 8

Comm'r Elad Roisman, *Dissenting Statement on Proposed Rules Regarding Share Repurchases* (Dec. 15, 2021) ........................ 56

C. Schumer & B. Sanders, *Limit Corporate Stock Buybacks*, N.Y. Times (Feb. 3, 2019) .................................................................. 8

SEC Office of Inspector General, *The Inspector General's Statement on the SEC's Management and Performance Challenges* (2022) ................................................................................ 56

SEC, Open Meeting (May 3, 2023) ..................................................... 14, 15

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

SEC Staff, *Response to Congress: Negative Net Equity Issuance* 7 (2020)....................................................................5

Comm'r Mark Uyeda, *Statement on Reopening of Comment Period for Share Repurchase Disclosure Modernization* (Dec. 7, 2022).......................................................................58

## INTRODUCTION

Often, when a publicly traded company has excess cash, one of the best investment opportunities available is to repurchase its own stock. This routine practice benefits shareholders by returning excess profits to them rather than allowing management to sink that money into less efficient expenditures or simply leaving it to gather dust. The staff of the U.S. Securities and Exchange Commission (Commission or SEC) previously understood this. In a detailed empirical study issued less than three years ago, the staff found that repurchases by U.S. companies largely enhanced shareholder value.

Ignoring its own staff's recent findings, the SEC in 2022 decided to turn its crosshairs on this longstanding business practice without regard for the ambit of its statutory mission. Based on little more than a hunch that the occasional bad actor "*may*" misuse repurchases to cause temporary price spikes that boost his compensation, the SEC issued an onerous rule imposing invasive and unconstitutional disclosure requirements on the nearly two-thirds of domestic stock issuers that repurchase shares each year. *Share Repurchase Disclosure Modernization*, Release No. 34-97423, Dkt. 2 (Buyback Rule, Final Rule,

or Rule); *accord* <u>88 Fed. Reg. 36,002</u> (June 1, 2023). Before the Rule, companies merely had to disclose straightforward repurchase data aggregated by month. Now, they are subject to two burdensome requirements. First, the "rationale-disclosure requirement" will compel companies to publicly justify their rationale for each individual repurchase—a topic that has recently become among the most controversial and politicized decisions a company makes. Second, the "daily-data requirement" will force companies to disclose granular data aggregated on a day-by-day basis—data unusable to the average retail investor whom the SEC is supposed to protect.

Both of these requirements are unlawful and should be vacated. Foremost, the rationale-disclosure requirement violates the First Amendment. While the Constitution may permit the government to require that businesses disclose objective, uncontroversial facts in a commercial setting, it has never allowed the government to compel private parties to disclose their subjective reasons for business decisions, especially ones the government deems "controversial." And because the SEC concedes that the daily-data requirement is intertwined with this unconstitutional compulsion of speech, it should be vacated too.

On top of that, the entire Rule is arbitrary and capricious. Despite the SEC's special statutory duty to rigorously weigh the costs and benefits of its rules, it failed to do so on at least four levels. Specifically, the SEC did not: (1) quantify quantifiable effects, (2) determine whether the Rule's benefits are real or purely hypothetical, (3) meaningfully account for Congress's recent passage of an excise tax on repurchases that already discourages the same activity the Rule targets, or (4) explain why the purported benefits of the Rule outweigh its costs. These deficiencies both independently and collectively doom the Rule.

Finally, by offering only a slapdash analysis, the SEC punted to commenters the duty of assessing the Rule's economic effects. Yet despite foisting its analytical burden onto the public, the agency undermined the public's ability to carry it. In prior administrations spanning both parties, the SEC typically provided a 90- or 120-day comment period for a rule of this magnitude. Here, however, it administered an unpredictable, stop-start comment process with significantly shorter periods that deprived the public of a meaningful opportunity to weigh in. The SEC cannot use a problem created by its willfully deficient comment period to justify a deficient cost-benefit analysis. For that reason, too, the Rule is unlawful.

3

In short, the SEC has imagined a problem that its own staff recently found did not exist, and then attempted to fix it through mandates that are neither constitutional nor reasonably explained—all on an indefensibly compressed schedule. This is the epitome of arbitrary-and-capricious rulemaking. The Court should set the Rule aside.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 80a-42(a), which permits persons aggrieved by SEC orders—including final rules—issued under the Investment Company Act to file a petition for review directly in the applicable Court of Appeals. *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 617 n.1 (D.C. Cir. 2019). The order under review was issued under the Act on May 3, 2023. Final Rule 178, 193; 17 C.F.R. § 201.140(c).

Petitioners—the U.S. Chamber of Commerce (Chamber), the Texas Association of Business (TAB), and the Longview Chamber of Commerce—filed a petition for review in this Court on May 12, 2023. Dkt. 1-1. After the SEC published the Final Rule in the Federal Register on June 1, 2023, Petitioners filed a second, protective petition for review on June 2, 2023, Dkt. 31-1.

4

Petitioners have standing to file this petition. All have members directly subject to the Rule's requirements; the interests at issue are germane to Petitioners' purposes of representing U.S., Texas, and Longview business interests; and no individual member's participation is necessary to resolve the legal claims in this petition. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); Quaadman Decl., Ex. A, ¶¶ 3-17; Hamer Decl., Ex. B, ¶¶ 3-15; *infra* at 16-17.

Venue is proper in this Circuit because TAB has its principal place of business in Austin, Texas. 15 U.S.C. § 80a-42(a); Hamer Decl. ¶ 3.

## STATEMENT OF THE ISSUES

**1.** Whether **(a)** the rationale-disclosure requirement should be set aside because it unconstitutionally compels speech and **(b)** the daily-data requirement should be set aside as arbitrary because its justification depends on the validity of the rationale-disclosure requirement.

**2.** Whether the Rule should be set aside as arbitrary because the Commission did not reasonably assess its costs and benefits.

**3.** Whether the Rule should be set aside because the Commission denied the public a meaningful opportunity to comment.

STATEMENT OF THE CASE

### A.    Stock Buybacks

A stock "buyback" or "repurchase" occurs when a company buys shares of its own stock. SEC Staff, *Response to Congress: Negative Net Equity Issuance* 7 (2020) (Staff Study), https://perma.cc/ZK6M-55LK. Companies typically repurchase their stock on the open market and often publicly announce their plans to do so, causing share prices to rise and benefitting shareholders at large. *See id.* at 5 n.7, 10.

Buybacks are a longstanding practice. U.S. companies have repurchased stock for over four decades, and the practice has only grown more popular over time. *Id.* at 8. Today, two-thirds of domestic issuers buy back stock each year, with over $950 billion in shares repurchased in 2021. *Id.* at 18. For the past decade, repurchases have been "on par with dividends" as the primary way of returning profits to investors. *Id.* at 6.

As the SEC has recognized, companies repurchase their stock for a variety of reasons that generally benefit all shareholders. Foremost is returning profits in the absence of efficient investment opportunities. Final Rule 13. Buybacks have certain advantages over dividends in this respect. *Id.* Dividends are typically taxed as ordinary income. But for

6

buybacks, shareholders either pay only capital gains tax (if they sell to the company) or can defer taxation altogether (if they hold the stock at the now-higher price). *Id.*

Buybacks also leave the company with greater "flexibility." *Id.* Once a company issues a dividend, the market generally expects it to continue to issue dividends at the same level over time. *Id.* at 16-17. But there is no similar expectation with buybacks. *Id.* Buybacks therefore allow companies to return profits *today* while keeping open the possibility of making new investments with excess cash tomorrow.

Buybacks further allow management "to signal" to outsiders that the company is currently undervalued and to provide "price support by supplying liquidity when selling pressure is high." *Id.* at 110; *accord* Staff Study 5. When shareholders start selling for one reason or another, a company can repurchase stock to stabilize the price.

Since 2003, the SEC has required stock issuers to disclose data about their repurchases each quarter. For each month of the quarter, they have had to report, among other information, the total number of shares repurchased and the average price paid per share. Final Rule 5-6.

## B.    Manufacturing Controversy Around Buybacks

Because buybacks benefit shareholders rather than redistribute wealth, certain political actors have recently tried to cast them as illicit tools of corporate greed. Specifically, politicians who reject the longstanding principle that corporations exist to return a profit to their shareholders (*i.e.*, their owners) have complained that buybacks allow companies to accomplish that purpose too efficiently.

In 2018, for instance, Senator Warren and 20 of her colleagues wrote to the SEC to share their "concerns" that companies are using "buybacks" to "funnel[] corporate profits to wealthy shareholders … instead of workers." Letter of Sen. Tammy Baldwin et al. to Jay Clayton, Chair, SEC (June 28, 2018), https://perma.cc/X6PE-DXRP. The following year, Senators Schumer and Sanders bemoaned that corporations "have been dedicating ever larger shares of their profits to dividends and corporate share repurchases" because they are "obsessed with maximizing [] shareholder earnings," instead of redistributing profits to non-shareholders. C. Schumer & B. Sanders, *Limit Corporate Stock Buybacks*, N.Y. Times (Feb. 3, 2019), https://perma.cc/4YLM-7Q5T. And a few months later, Representative Ocasio-Cortez complained that

companies "increas[e] profits for shareholders" by "buy[ing] [their] own stock," rather than spending excess cash on making their "employees more happy." *Promoting Economic Growth: A Review of Proposals to Strengthen the Rights and Protection of Workers: Hearing Before the House Subcommittee on Investor Protection Entrepreneurship, and Capital Markets* 37 (May 15, 2019).

In his most recent state-of-the-union address, President Biden likewise called for new taxes on buybacks to reduce "outrageous" corporate profits. *President Biden's State of the Union Address*, White House (Feb. 7, 2023), https://perma.cc/848S-7ED4. He criticized companies for "us[ing]" their "profits to buy back their own stock, rewarding their CEOs and shareholders," instead of "do[ing] the right thing." *Id.* Some in Congress have even proposed outlawing buybacks altogether. Reward Work Act, H.R. 3355, 116th Cong. § 2 (2019).

Because the "basic purpose" of the Securities Exchange Act is to protect "investor[s]," *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 390 (2014), the SEC could never *overtly* clamp down on buybacks on the basis that they are too effective at maximizing shareholder value. Perhaps recognizing this reality, some have reframed the common

criticisms of buybacks by politicians as concerns that the practice is not, in fact, in shareholders' best interests. Former SEC Commissioner Jackson, for example, has claimed that "executives" use buybacks "to cash out their compensation at investor expense." Robert Jackson, *Stock Buybacks and Corporate Cashouts* (June 11, 2018) (Jackson Speech), https://perma.cc/SHN4-J8DM. Specifically, managers supposedly use buybacks to create "short-term stock-price spikes" during which they sell personal shares in the company, enriching themselves but undermining the company's "long-term growth." *Id.* Executives also allegedly use buybacks to artificially inflate their companies' total earnings per share and thereby obtain performance bonuses based on that statistic. *See id.*

## C.    The SEC's 2020 Staff Study

In response to this criticism, Congress directed the Commission's staff to study buybacks and the motives behind them. *See* H. Comm. on Appropriations, *Consolidated Appropriations Act, 2020*, H.R. 1158, at 652 (2020); Staff Study 3 & n.1. But the results did not vindicate the critics— quite the opposite. In 2020, SEC staff conducted an "empirical analysis" of the long-term repurchase activity of domestic firms listed on the NYSE, NYSE American, and NASDAQ exchanges. Staff Study 5, 12. The study

found this activity was "consistent" with the value-maximizing motivations of returning excess cash in the absence of more profitable investment opportunities and providing price support when the company's stock is undervalued. *Id.* at 30-31, 37-38. In particular, its analysis of buybacks following the 2017 tax bill found that "companies are investing efficiently" through repurchases. *Id.* at 31.

Moreover, SEC staff did not find that "repurchase announcements were primarily motivated by manipulation efforts." *Id.* If that were the case, "one would expect to see share prices correct to the pre-announcement level," which is not what "research shows." *Id.* at 38. Nor did the study find that executive compensation was driving repurchase decisions. Given that "82% of the firms reviewed either did not have [earnings-per-share]-linked compensation targets" or "considered the impact of repurchases" when determining if those targets were met, it appears "that most repurchase activity does not represent an effort to influence" executive "compensation." *Id.* at 42. The study concluded that "most repurchases" appear to be "consistent with efficient investment." *Id.* at 45.

11

### D.   The Proposed Rule

Within months of taking office, President Biden appointed a new Chair of the Commission in April 2021. In February 2022, the SEC then proposed a rule targeting the supposed harmful effects of buybacks, notwithstanding its staff's recent findings. 87 Fed. Reg. 8443 (Feb. 15, 2022) (Proposed Rule).

The SEC premised its proposal on the very same politician-driven concerns about buybacks that its staff had found unsupported. The Commission noted that some "observers" and "commentators"—Senator Warren and former-Commissioner Jackson chief among them—were concerned that executives use buybacks to meet earnings-per-share targets and temporarily inflate stock prices before insider sales. *Id.* at 8444-45. Given these "concerns" and the "growth" of buybacks generally, the SEC believed "investors could benefit" from additional disclosure requirements for repurchases. *Id.* at 8445.

The Proposed Rule contained two principal requirements. *First*, issuers would have to publicly file a "narrative" detailing their "objective or rationale" for their share repurchases. *Id.* at 8449-50. Any issuer whose stated rationale is deemed "false" or "misleading" would face

12

private damages actions under the Securities Exchange Act. *See* 15 U.S.C. § 78r(a). *Second*, issuers would have to disclose detailed data about their repurchases—such as the number of shares purchased and average price—within a business day of each repurchase order. 87 Fed. Reg. at 8446. All of this marked a stark increase from existing requirements, which require only that issuers release on a quarterly basis data aggregated by month without any explanation of the rationale for their repurchases. *Supra* at 7.

The SEC claimed the Proposed Rule would generate two primary benefits. *First*, it would allow investors to better identify "value-destroying or opportunistic repurchases." 87 Fed. Reg. at 8457. *Second*, disclosing more information would reduce "information asymmetries" between issuers and investors. *Id.* at 8456. That is, the SEC argued the additional disclosures would give the public valuable information about an issuer's true value currently known only by management.

The Commission acknowledged, however, that the Proposed Rule would impose on businesses both the direct costs of preparing the new disclosures as well as indirect costs, such as making economically beneficial repurchases more costly and requiring the revelation of

13

proprietary business information. *Id.* at 8458-60. The SEC did not, however, quantify or rigorously compare the Proposed Rule's costs and benefits. It instead declared that the economic "effects … cannot be quantified" and "encourage[d] commenters to provide data and information" that would make quantification possible. *Id.* at 8451.

### E.    The Comment Process

Despite acknowledging that public input was critical, the Commission initially provided just 45 days to submit comments. *Id.* at 8443. This was a departure from its historic practice of allowing at least 60 days for comment on standard rules and even more time for rules with significant effects nationwide, like the one here.

Shortly after that period began, the Chamber submitted a comment explaining that the 45-day window was insufficient and requesting an extension. Admin. Dkt. 26 (Comment I). After the SEC failed to respond, the Chamber filed another comment detailing the flaws in the agency's weighing of costs and benefits, Admin. Dkt. 70 (Comment II), along with a detailed analysis of the Proposed Rule by Craig Lewis and Joshua White—two former SEC economists who are now finance professors at Vanderbilt University, Admin. Dkt. 70 (Comment II Addendum).

14

In August 2022, Congress enacted the Inflation Reduction Act, which included a 1% excise tax on stock repurchases, the first such tax in American history. 26 U.S.C. § 4501. The Chamber promptly advised the Commission to reconsider the Proposed Rule in light of the tax. Admin. Dkt. 107 (Comment III).

The SEC briefly reopened the comment window in October 2022 to allow resubmission of comments that had not been received due to a glitch in its system. 87 Fed. Reg. 63,016 (Oct. 18, 2022). The Chamber combined its previous comments into a single document and resubmitted them. Admin. Dkt. 136 (Comment IV).

In December 2022, the SEC reopened the comment period for a second and final time to address the excise tax. 87 Fed. Reg. 75,975 (Dec. 12, 2022) (*Excise Tax Reopening*). Commission staff had prepared an analysis of the tax's effects, Admin. Dkt. 182 (Staff Memorandum), and the SEC gave the public 30 days—spanning the December holidays—to comment on it. 87 Fed. Reg. at 75,976. The Chamber submitted an additional comment detailing the Staff Memorandum's deficiencies. Admin. Dkt. 168 (Comment V).

### F.    The Final Rule

On May 3, 2023, the SEC adopted the Final Rule by a 3-2 party-line vote. Final Rule 193. Immediately before voting in favor of the Final Rule, Chair Gensler described buybacks as "merit neutral" and "just part of how companies return capital to their shareholders." SEC, Open Meeting (May 3, 2023), https://perma.cc/T7QZ-F9FJ.

As with the Proposed Rule, the Final Rule requires issuers to explain their subjective rationale for every buyback, Final Rule 74-75, and disclose their repurchase data on a day-by-day rather than monthly-aggregated basis, *id.* at 44-45. But under the Final Rule, issuers must file this data each quarter, not within a business day of each repurchase. *Id.*[1] The Rule includes a separate mandate requiring the quarterly disclosure of the adoption and termination of certain trading plans. *Id.* at 87-91.

### G.    This Litigation

On May 12, 2023, the Chamber, the Longview Chamber of Commerce, and TAB filed a petition for review of the Rule in this Court. Dkt. 1-1. Hundreds of Chamber and TAB members conduct buybacks and

---

[1] The Rule extends its daily-disclosure requirement to foreign private issuers as well. Final Rule 191-92, 200-03.

16

will be harmed if the Rule goes into effect. Quaadman Decl. ¶¶ 8-17; Hamer Decl. ¶¶ 7-15. After the Final Rule appeared in the Federal Register, Petitioners filed a second, protective petition. Dkt. 31; *see Horsehead Res. Dev. Co. v. EPA*, 130 F.3d 1090, 1095 (D.C. Cir. 1997).

## SUMMARY OF THE ARGUMENT

**I.** The rationale-disclosure requirement violates the First Amendment. Government compulsion of speech must satisfy strict scrutiny unless the government can show that the compelled speech is confined to factual, noncontroversial information. A company's subjective rationale for a business decision is not an objective fact, and the motives underlying buybacks have become a politically controversial topic. The rationale-disclosure requirement thus must satisfy strict scrutiny, which it plainly cannot do. And even if some lesser form of First Amendment review applies, this requirement would still fail, given its purely hypothetical benefits, substantial costs, and lack of tailoring.

Once the rationale-disclosure requirement falls away, the SEC lacks any adequate justification for the daily-data requirement under the APA. While the Commission attempted to explain why the daily-data requirement yields benefits that justify its costs *when paired with the*

17

*rationale-disclosure requirement*, it never attempted to justify the daily-data requirement *on its own*. The record thus cannot support the latter requirement in isolation. The Court should therefore vacate both of the Rule's central requirements.

**II.**    In addition to its constitutional defects, the Rule is invalid because the SEC's assessment of costs and benefits was deficient in at least four major ways. Each of these flaws is an independently sufficient basis to vacate the Rule as arbitrary and capricious.

*First*, the SEC quantified virtually none of the Rule's effects despite multiple concrete suggestions from the Chamber on how to do so. The SEC cannot be relieved of this responsibility by punting it to commenters while simultaneously denying them enough time to do the job.

*Second*, the SEC did not reasonably assess the Rule's purported benefits. In the face of conflicting evidence, including its own Staff Report, the SEC failed to make an informed judgment about whether improperly motivated buybacks actually occur to any significant extent, stating only that bad motives *may sometimes* be *a* factor. It likewise never considered whether its related insider-trading rule obviated whatever problem might exist. The Commission also engaged in inconsistent reasoning

18

concerning the purported benefit of reducing information asymmetries and did not adequately consider the possibility that reducing such asymmetries could disincentivize the discovery of useful information.

*Third*, the SEC did not adequately address the effect of the recent excise tax on buybacks. It did not grapple with the obvious point that the tax's effect of reducing repurchases may decrease the Rule's net benefit. Nor did it consider whether the tax would disproportionately deter the improper buybacks that the Rule purports to address. Nor did it account for the fact that its staff's analysis of the tax's effects was based on the *Proposed* Rule, not the materially different *Final* Rule.

*Fourth*, the SEC did not adequately assess the Rule's overall effects. The Commission did not explain why the costs it identified—including the deterrence of the many repurchases that are concededly beneficial— were less than the Rule's benefits, nor did it account for all the costs it had previously identified. The SEC also recognized that the Rule imposes a burden on competition for smaller issuers but then failed to make the statutorily required finding that the Rule was nonetheless "necessary or appropriate." 15 U.S.C. § 78w(a)(2).

**III.** Finally, the SEC did not provide the meaningful "opportunity to participate" in the rulemaking that the APA requires. 5 U.S.C. § 553(c). Despite the difficult empirical questions involved and the SEC's historic commitment to a *minimum* of 60 days to comment, it initially gave just 45 days to comment on the Rule, and then only 30 days to comment on its analysis of the brand-new excise tax. These abbreviated windows, and the stop-start nature of the process, hindered the Chamber's ability to provide a detailed empirical analysis of the Rule. This basic procedural deficiency supplies yet another basis to vacate the Rule.

## STANDARD OF REVIEW

The APA requires this Court to "set aside" agency actions found to be "arbitrary [or] capricious," "contrary to constitutional right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(B), (D). Agency answers to "purely legal questions" are reviewed *de novo*. *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).

## ARGUMENT

## I. THE FIRST AMENDMENT REQUIRES SETTING ASIDE THE RATIONALE-DISCLOSURE AND DAILY-DATA REQUIREMENTS.

The Rule's rationale-disclosure requirement should be set aside foremost because it unconstitutionally compels speech. And because the rationale-disclosure requirement is the SEC's primary justification for the daily-disclosure mandate, that burdensome mandate cannot stand on its own. The Court should thus vacate that mandate, too.

### A. The Rationale-Disclosure Requirement Contravenes The First Amendment.

The First Amendment prohibits "abridging the freedom of speech." U.S. Const. amend. I. This freedom "includes both the right to speak freely and the right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), and it "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). Thus, "[f]or corporations as for individuals, the choice to speak includes within it the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n*, 475 U.S. 1, 16 (1986) (plurality op.) (holding that a state cannot require a private utility company to

include speech it opposes in its billing envelopes). Laws compelling speech are thus "presumptively unconstitutional" and almost always trigger strict scrutiny. *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018). That is, they "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*

By requiring companies to explain the subjective reasons for their business decisions, the rationale-disclosure requirement infringes on their freedom "to remain silent," triggering strict scrutiny. *303 Creative LLC v. Elenis*, No. 21-476, slip op. at 9 (U.S. June 30, 2023). The SEC does not, and cannot, claim that this mandate survives that demanding test. Instead, it argues that the requirement triggers and survives a less demanding form of review on the premise that the disclosure "is factual in nature" and "advances important interests." Final Rule 81. The premise is incorrect, and the conclusion does not follow. *Even if* the Court applies the more deferential scrutiny reserved for mandatory disclosures of neutral commercial facts, the Rule would fail. The simple reality is that the rationale-disclosure requirement cannot satisfy *any* relevant level of First Amendment review.

### *1.    No exception to strict scrutiny applies.*

To avoid strict scrutiny, the Commission must carry "the burden of proving" that the expression compelled "falls outside the category of [fully] protected speech." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022). The SEC cannot make that showing. The rationale-disclosure requirement does not fall into either of the potential exceptions to strict scrutiny.

**a.**    To start, the limited exception recognized in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), does not apply. That case held that the government can compel the disclosure of "information" in the context of certain "'commercial speech'" if the information is both "purely factual" and "noncontroversial," *NIFLA*, 138 S. Ct. at 2372. A company's subjective business rationale for repurchasing stock is neither.

In First Amendment doctrine, "statements of fact" are distinct from "expressions of value, opinion, or endorsement," *Hurley*, 515 U.S. at 573, and *Zauderer* thus does not apply to "matters of opinion," *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 555 (6th Cir. 2012). Instead, *Zauderer* covers only mundane factual matters not subject to reasonable dispute, such as "country-of-origin labels" on imports, *Am.*

23

*Meat Inst. v. USDA* (*AMI*), 760 F.3d 18, 20 (D.C. Cir. 2014) (en banc), or disclaimers that a courtroom scene in an attorney advertisement is a reenactment, *Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 227 (5th Cir. 2011).

The rationale-disclosure requirement is fundamentally different. A company's *reason* for repurchasing its stock is not a rote fact; it is the company's *subjective opinion* about the business benefits of its actions and the market's estimation of its stock price. Confirming the point, the SEC rejected the possibility that companies could rely on "boilerplate language" to explain their repurchases, instead directing that they "discuss[] other possible ways to use the funds," "compar[e] the repurchase with other investment opportunities," and "discuss the factors driving the repurchase." Final Rule 79. That basic difference takes this requirement outside *Zauderer*'s limited exception.

In addition, even if a company's rationale for repurchasing shares were somehow purely factual, the Rule requires that companies opine on a "'[]controversial' topic," *NIFLA*, 138 S. Ct. at 2372—independently taking it outside *Zauderer* review. *See Nat'l Ass'n of Mfrs. v. SEC* (*NAM*), 800 F.3d 518, 528 (D.C. Cir. 2015) ("'uncontroversial,' as a legal test, must

mean something different than 'purely factual'"). A disclosure is controversial under *Zauderer* if it implicates significant policy or factual disagreement. *See NIFLA*, 138 S. Ct. at 2369, 2372. For instance, it is "controversial" to require a food packager to list an ingredient as a carcinogen if there is "robust disagreement" as to whether it causes cancer. *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022). Likewise, it is "controversial" to require beverage makers to warn that added sugars contribute to obesity. *Am. Beverage Ass'n v. San Francisco*, 916 F.3d 749, 761 (9th Cir. 2019) (en banc) (Ikuta, J., concurring in the judgment). Although the statement is "literally" true, it is controversial because many experts believe sugar-added drinks are "safe" in moderation. *Id.*

Likewise, stock buybacks have recently become "one of the most controversial corporate decisions today." Alex Edmans, *Do Share Buybacks Really Destroy Long-Term Value?*, Harv. L.S. Forum on Corp. Governance (Oct. 22, 2020), https://perma.cc/KZ32-YR67. Policymakers hotly contest why buybacks are done and to what extent they are beneficial. For instance, in 2018, then-Commissioner Jackson claimed that "executives are using buybacks as a chance to cash out their

25

compensation at investor expense." Jackson Speech, *supra*. But the 2020 SEC Staff Study took a different position, concluding "that most repurchase activity does not represent an effort to artificially inflate stock prices or influence" executive pay. Staff Study 45. The Final Rule, for its part, claimed to note multiple disagreements on the motives behind and effects of buybacks—disagreements the Rule declined to resolve. *Infra* at 44-45.

More fundamentally, the value of buybacks even when they serve shareholder interests is fiercely debated. The SEC and many economists recognize that buybacks are beneficial when they serve shareholder interests. *Supra* at 6-7, 10-11, 16; *infra* at 43 n.2. In contrast, the President and many members of Congress find even the efficient use of buybacks "outrageous." *Supra* at 8-9. Given these ongoing debates, a company's reasons for repurchasing shares have plainly become controversial. The *Zauderer* exception to standard First Amendment scrutiny is thus doubly inapplicable.

**b.** For the same reasons, the general test for commercial speech set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980), does not apply either. Although courts

sometimes refer to *Zauderer* and *Central Hudson* as distinct standards, *Zauderer* is "simply … an application of *Central Hudson*" to "the context of compelled commercial disclosures," "not a different test altogether," *AMI*, 760 F.3d at 33 (Kavanaugh, J., concurring). Thus, if a disclosure requirement does not "fit[] within the framework of *Zauderer*," it falls outside *Central Hudson* as well, and the Court must "apply strict scrutiny." *Disc. Tobacco*, 674 F.3d at 554.

Indeed, the compelled disclosures here are not commercial speech at all. "Commercial speech is speech 'that *proposes* a commercial transaction.'" *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016). The government-mandated statements here, however, are not made in advertisements or in connection with any future transaction. Rather, they address a company's business reasons for its prior share repurchases. They do not lose the full protection of the First Amendment merely by relating to commerce. *See id.* ("Some of our most valued forms of fully protected speech are uttered for a profit.") (cleaned up).

Nor should the rationale-disclosure requirement "face relaxed review just because Congress used the 'securities' label." *NAM*, 800 F.3d at 555. While the SEC has long imposed disclosure obligations on issuers,

the First Amendment does not contain some sort of *ad hoc* securities

exception. Nor is one necessary to preserve ordinary SEC disclosure

rules—many of these requirements are the sorts of compelled disclosure

of uncontroversial facts in the context of prospective securities

transactions that *Zauderer* allows. *See Riley v. Nat'l Fed'n of the Blind*,

487 U.S. 781, 796 n.9 (1988). And when the SEC has exceeded what

*Zauderer* permits, courts have not hesitated to find a First Amendment

violation. *See, e.g.*, *NAM*, 800 F.3d at 524-30 (SEC rule that companies

certify products were "conflict free" was unconstitutional because it fell

outside *Zauderer* and would fail *Zauderer* review in any event).

Finally, even if the applicable standard of scrutiny were a close

question, the Constitution requires erring on the side of free speech.

Lesser protections for commercial speech are based not on text or history

but on *ad hoc* judicial interest-balancing. *See Eastman Chem. Co. v.*

*Plastipure, Inc.*, 775 F.3d 230, 236 n.1 (5th Cir. 2014); *44 Liquormart, Inc.*

*v. Rhode Island*, 517 U.S. 484, 517 (1996) (Scalia, J., concurring in the

judgment); *id.* at 522-23 & n.4 (Thomas, J., concurring in the judgment).

Hence, to the extent there are "questions about the scope" of *Zauderer* or

*Central Hudson*, this Court should resolve them "in the direction of the

constitutional text … and not allow encroachments on" freedom of speech "beyond what [those precedents] already permit." *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (addressing separation of powers), *rev'd*, 561 U.S. 477 (2010). The Court should thus not extend the *Zauderer* and *Central Hudson* framework to the rationale-disclosure requirement, let alone uphold that mandate under those frameworks.

### 2. The requirement fails any degree of First Amendment review.

Even if this Court were to apply an exception to strict scrutiny, it would not save the Rule. "Even under *Zauderer*, a disclosure requirement cannot be 'unjustified'" or "'unduly burdensome,'" and the SEC bears the burden of showing that the rationale-disclosure requirement is neither. *NIFLA*, 138 S. Ct. at 2377. For the requirement to be justified, the Commission must show that "the harm" it seeks "to remedy" is "more than 'purely hypothetical.'" *Id.* And it must further show that the requirement "will in fact alleviate [the harm] to a material degree." *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146 (1994). At the second stage, a requirement is unduly burdensome when its burdens are "unreasonable" in relation to its benefits, *Zauderer*, 471 U.S. at 653 n.15,

or when its coverage is either "curiously narrow" or "broader than reasonably necessary," *NIFLA*, 138 S. Ct. at 2377. Both of these requirements are "stringent" and "demanding," and "tightly limit[] mandatory disclosures to a very narrow class." *AMI*, 760 F.3d at 34 (Kavanaugh, J., concurring).

The SEC cannot satisfy either stage of this test.

*First*, the Commission has failed to "present[] a nonhypothetical justification" for the rationale-disclosure requirement. *NIFLA*, 138 S. Ct. at 2377. The justification that managers conduct improperly motivated buybacks is *concededly* hypothetical. When commenters presented evidence undermining this theory, the SEC countered only that "personal benefit *may* be *a* factor in determining whether to undertake a share repurchase." Final Rule 17 (emphases added); *see infra* at 43-45. As to the justification that knowing a corporation's rationale for buybacks would help investors assess the corporation's value, the Commission admitted it is "unclear" how much valuable information additional disclosures would reveal "above and beyond" what is already available and further conceded that the rationale-disclosure requirement may have only "limited" value. Final Rule 128, 134; *see infra* at 48-50.

30

*Second,* the requirement is unduly burdensome. Petitioners' members believe stock buybacks are ordinary business decisions undertaken for the good of shareholders, no different from countless other choices that companies have no special duty to publicly justify. Quaadman Decl. ¶¶ 9, 12; Hamer Decl. ¶¶ 7, 10. The First Amendment protects the right to express this perspective by "remaining silent." *Hurley*, 515 U.S. at 574. The rationale-disclosure requirement interferes with this message by compelling companies to issue public statements defending their decisions to repurchase stock. It implies that repurchases are inherently suspect actions requiring a special justification and forces companies to echo that implication through their public speech. *See NAM*, 800 F.3d at 530 (SEC rule that "require[d] an issuer to tell consumers that its products are ethically tainted" was unduly burdensome).

The requirement imposes other costs as well. It will force companies to reveal "valuable private information to competitors." Final Rule 122. It will require management and their lawyers to spend substantial time and effort characterizing repurchasing decisions and drafting language to minimize litigation threats, while inevitably exposing companies to additional legal risk. *Id.* at 136, 140; Quaadman Decl. ¶ 13; Hamer Decl.

31

¶ 11. Given the minimal and entirely speculative benefits of the requirement, these burdens are clearly undue.

The rationale-disclosure requirement is also not reasonably tailored to the requirement's purported justifications. With respect to exposing improperly motivated buybacks, the requirement is "broader than reasonably necessary." *NIFLA*, 138 S. Ct. at 2377. Although "'most' repurchases are consistent with shareholder value maximization," Final Rule 23, and buybacks are concentrated in certain industries, Staff Study 20-24, the requirement applies indiscriminately to *all* issuers, with no attempt to distinguish those likely to commit misconduct from the innocent majority. And in those rare cases where shareholders believe directors are improperly authorizing buybacks to inflate compensation, they can always bring derivative suits—a solution the Commission itself touts as "'an effective corporate governance mechanism'" that "curtails inefficient managerial behavior." Final Rule 138 n.477.

Conversely, the requirement is "curiously narrow" when it comes to discovering issuers' true value. *NIFLA*, 138 S. Ct. at 2377. Buybacks are just one of many governance decisions management makes with the benefit of material nonpublic information. If the goal is to make such

information public, there is no evident reason to require an explanation for buybacks alone and not the many other consequential decisions based on private information—such as to issue dividends, to make significant capital investments, or to *not* repurchase stock.

In short, the requirement addresses hypothetical problems that are better addressed by already available tools, imposes substantial costs to yield illusory benefits, and is not reasonably tailored to the issues it purportedly addresses. It is precisely the kind of "unwarranted government regulation" that contravenes the First Amendment—even in the realm of "commercial speech." *Cent. Hudson*, 447 U.S. at 561.

Even if *Central Hudson* embodies a test distinct from *Zauderer*, the Rule would still fail. Under *Central Hudson*, the SEC's "burden is a 'heavy' one," *Pub. Citizen*, 632 F.3d at 218, and the agency cannot carry it. Since the problems the requirement ostensibly addresses are purely hypothetical, the SEC has not invoked any "substantial" interest. *Cent. Hudson*, 447 U.S. at 564. And even if it had done so, the requirement would not "directly advance" the Commission's asserted interests, *id.*, because the mandate's benefits are concededly "limited," Final Rule 128, and would not actually help investors, *see infra* Part II.B. Finally, since

the requirement is significantly over- and underinclusive, it is not "narrowly drawn." *Cent. Hudson*, <u>447 U.S. at 565</u>. For the same reasons, the Rule cannot survive strict scrutiny, as the SEC implicitly concedes. *Supra* at 22.

## B.    Given This Constitutional Defect, The Daily-Disclosure Requirement Must Be Set Aside As Well.

The    constitutional    deficiency    in    the    rationale-disclosure requirement dooms the requirement to disclosure granular repurchase data on a day-by-day basis as well. The SEC reasoned that the daily-disclosure requirement would—*when operating in tandem with the rationale-disclosure requirement*—produce significant benefits that justify the Rule's costs. Final Rule 21-22. But the rationale-disclosure requirement is legally void, so it *cannot* operate alongside the daily-disclosure requirement. The Commission never assessed, much less justified, the daily-disclosure requirement standing alone. It thus has not supplied an adequate justification under the APA for that mandate.

The Rule's disclosure requirements have a single principal "purpose"— "to improve the information investors receive to better assess the efficiency of, and motives behind, an issuer repurchase." *Id.* at 21. The SEC contends that currently "investors cannot readily determine the

34

purposes behind any given share repurchase." *Id.* at 18. With the Rule's requirements in place, however, it believes investors will be better able to "evaluate whether a share repurchase was intended to increase the value of the firm or represented an inefficient deployment of capital … not intended to increase overall firm value." *Id.* at 21. This will in turn theoretically allow investors to ferret out executive misconduct and discover the issuer's true value. *Id.* at 21-22.

In the SEC's telling, the daily-disclosure requirement cannot accomplish this core purpose on its own. The Commission openly acknowledged that the "daily quantitative repurchase data we are requiring … will not by themselves establish that a repurchase was undertaken for any particular purpose." *Id.* at 25. "As a result," the Rule "also require[s]" issuers to disclose their rationale. *Id.* Only when "the quantitative and qualitative information … work together" will investors be able to sort the good repurchases from the bad. *Id.*

Because the rationale-disclosure requirement is unconstitutional and therefore void, the daily-disclosure requirement cannot accomplish the Commission's central purpose even under the agency's own reasoning. That renders this requirement arbitrary and capricious. *See Wild Fish*

35

*Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010) (agency decision made in "reliance on a legally flawed" premise is "arbitrary and capricious"). Nor did the SEC identify "adequate and independent grounds" for the daily-disclosure requirement apart from its relationship to the rationale-disclosure requirement. *Steel Mfrs. Ass'n v. EPA*, 27 F.3d 642, 649 (D.C. Cir. 1994) (explaining that when an agency gives multiple justifications for a rule without clearly identifying them as "independent[ly]" sufficient, every justification must withstand APA scrutiny for the rule to survive); *see United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011) (an "APA deficiency" is harmless "only when it is one that clearly had no bearing on the procedure used or the substance of decision reached" (cleaned up)). In short, the SEC failed to "articulate a satisfactory explanation" for adopting a daily-disclosure requirement on its own, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and that requirement accordingly fails.

In addition, the SEC never determined the economic effects of the daily-disclosure requirement standing alone. On top of its general obligations under the APA, the Commission has a specific statutory duty to consider whether its rules "will promote efficiency, competition, and

capital formation." 15 U.S.C. §§ 78c(f), 80a-2(c). The SEC found that the "amended requirements" would *collectively* promote these goals by better informing investors and dissuading buybacks based on improper motives. Final Rule 143-46. But it made no finding that the daily-disclosure requirement would do so *by itself*. *See id.* Nor is such a finding implicit in the collective finding. As the SEC itself says, the disclosure requirements must "work together," *id.* at 25, and it does not follow from the *collective* finding that either requirement would *alone* have a positive effect. This "fail[ure] to consider factors [the SEC] must consider under its organic statute" also makes the daily-data requirement "arbitrary." *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005).

## II.    THE COMMISSION FAILED TO ENGAGE IN REASONED DECISIONMAKING.

In addition to its threshold constitutional defect, the Final Rule must be set aside as a whole because the Commission failed to engage in reasoned decisionmaking, contrary to the general requirements of the APA and the specific demands Congress imposes on the SEC. On top of its general obligation "to consider … important aspect[s] of the problem" before it, *State Farm*, 463 U.S. at 43, the Commission has a specific

37

statutory duty to consider whether its rules "will promote efficiency, competition, and capital formation." 15 U.S.C. §§ 78c(f), 80a-2(c). These provisions impose "a unique obligation" on the Commission "to 'apprise itself … of the economic consequences of a proposed regulation.'" *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011). And it requires the SEC to determine "as best it can" whether the benefits of a regulation exceed its costs. *Chamber*, 412 F.3d at 143. "[F]ailure" to discharge this obligation "makes promulgation of the rule arbitrary and capricious." *Bus. Roundtable*, 647 F.3d at 1148.

The Commission failed this requirement at every step of its analysis. Specifically, the SEC (1) did not give a reasonable explanation for its failure to quantify the Rule's costs and benefits, (2) did not adequately justify the Rule's purported benefits of addressing improperly motivated buybacks or reducing information asymmetries between issuers and investors, (3) did not reasonably assess the impact of the new excise tax on buybacks on the Rule's economic effects, and (4) did not reasonably determine the Rule's overall effect, including its deterrence of buybacks that all agree are beneficial. These deficiencies independently and collectively compel vacatur. *Id.*

## A. The Commission Did Not Reasonably Explain Its Failure to Quantify the Rule's Economic Effects.

To "determine *as best it can* the economic implications of the rule it has proposed," *Chamber*, 412 F.3d at 143 (emphasis added), the SEC must "adequately … quantify [its] certain costs" and benefits or "explain why [they] could not be quantified." *Bus. Roundtable*, 647 F.3d at 1148-49. Where a precise estimate is not feasible, the Commission must still calculate a "range" of costs or "estimate[] the cost to an individual" company. *Chamber*, 412 F.3d at 143-44.

Here, the SEC claimed it "attempted to quantify the economic effects expected from these amendments" "wherever possible," but the record reveals that to be false. Final Rule 99. Instead, the Commission asked commenters to provide quantification, while denying them the opportunity to develop the data.  It is then no surprise that despite the best efforts by commenters, such as the Chamber, to provide guidance on how such costs could be quantified, the SEC nevertheless assessed the effects of the Rule in almost entirely "qualitative" terms. *Id.* Throughout the Rule's Economic Analysis section, the only effect the Commission actually quantified was the number of issuers affected. *Id.* at 99-100.

The SEC tried to justify its failure to quantity effects in a footnote, claiming the "low frequency" of current disclosures have "limited the ability" to quantify the effect of "managerial incentives" on repurchases and to "gauge the extent of information asymmetry." *Id.* at 104 n.390. But this justification ignored the concrete proposals the Chamber offered in its comment to quantify effects of the Rule using data other than preexisting Item 703 disclosures under 17 C.F.R. § 229.703. Specifically, Professors Lewis and White made the following suggestions:

- The SEC could quantify "the percentage of issuers' annual and long-term incentive plans that is tied to [earnings per share] and how it correlates with buybacks" based on readily available "academic databases" that "provide detailed data on executive compensation." Comment II Addendum 10; *see* Staff Study 40-42 (performing a quantitative analysis of [earnings per share]-linked compensation and buybacks).

- The SEC could quantify "how many issuers used share repurchases to trigger an executive bonus that would not have been earned without repurchasing shares" and "the total executive compensation awarded from potentially opportunistic buybacks." Comment II Addendum 10. A British study had made such an estimate for U.K. issuers, and the SEC could simply "replicate the threshold analysis" of that study using U.S. data. *Id.* at 10-11.

- The SEC could quantify "the incremental benefits of potential reductions in asymmetric information stemming from the proposed amendments" in one of three ways. *Id.* at 16. It could (1) "examine how investors react to more frequent repurchase disclosure" in other jurisdictions; (2) use existing studies to "compare liquidity measures of similarly sized issuers operating in the same industry

that conduct buybacks across countries" with different disclosure frequencies; or (3) examine the movement of stock prices on days that repurchases are disclosed in jurisdictions with daily reporting. *Id.* at 16-17.

The SEC ignored each of these suggestions, even though in the Proposed Rule it had "encourag[ed] commenters to provide data and information that would help quantify the benefits, costs, and the potential impacts" of its proposal. 87 Fed. Reg. at 8451. This "fail[ure] to respond to significant points and consider all relevant factors raised by the public comments" renders the Rule "arbitrary-and-capricious." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021).

Not only that, but the Rule's footnote justification did not "explain why [the Rule's] costs could not be quantified." *Bus. Roundtable*, 647 F.3d at 1149. And that is so even though the SEC identified several important costs, such as the loss of economically efficient buybacks and increased litigation costs for issuers. The SEC did not try to estimate the magnitude of these costs despite recognizing that they exist. Final Rule 134-36.

Finally, even where the Commission did quantify costs, those quantifications did not feature in its analysis of the Rule's effects. In its Paperwork Reduction Act analysis, for example, the SEC gave a dollar estimate of certain direct costs of preparing the disclosures. *Id.* at 158-65.

But remarkably, it made no mention of this estimate in its Economic Analysis other than to observe in a footnote that it had performed the estimate. *Id.* at 133 n.469.

That is insufficient. The Securities Exchange Act does not require quantification for its own sake, but to help courts determine whether the SEC's rules actually "promote efficiency, competition, and capital formation" and impose only "necessary or appropriate" burdens. 15 U.S.C. §§ 78c(f),78w(a)(2); *see Bus. Roundtable*, 647 F.3d at 1148-49. To engage in reasoned decisionmaking, the SEC must make quantitative estimates where it can, and then *also* take those estimates into account when weighing the Rule's costs and benefits. *See Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (reasoned decisionmaking includes "considering the costs and benefits"). The Commission failed to take that basic step here, further requiring vacatur.

## B. The Commission Did Not Adequately Justify the Rule's Purported Benefits.

In addition to failing to quantify *costs*, the SEC did not substantiate the Rule's purported *benefits* of dissuading improperly motivated buybacks and reducing information asymmetries. Under the APA, an

agency issuing a new rule must overcome "a presumption … *against* changes in current policy that are not justified by the rulemaking record." *State Farm*, 463 U.S. at 42. And under the SEC's organic statutes, the Commission must use rigorous economic analysis to overcome that presumption. 15 U.S.C. §§ 78c(f),78w(a)(2), 80a-2(c). By not substantiating the Rule's benefits, the SEC failed to do so.

**1.** To start, even though the SEC claimed "the purpose" of the Rule is to ferret out improperly motivated buybacks, Final Rule 21, it never substantiated the threshold proposition that improperly motivated buybacks are actually a problem. Nor did it consider whether a related rule already addresses whatever problem may exist.

**a.** Faced with a wealth of evidence—including its own Staff Study—indicating that improperly motivated buybacks do not occur in significant numbers, the Commission retreated to a narrow defense of its Rule. *Supra* at 30.[2] Rather than try to show that the Rule addresses a

---

[2] The Chamber identified several reputable academic studies reaching similar conclusions to the Staff Study. Comment II at 6-7 & Addendum 10-12. For instance, a 2019 study of repurchase activity by 350 U.K. firms found *none* of them used buybacks to hit an earnings-per-share target it otherwise would have missed. Alex Edmans, *Share Repurchases, Executive Pay and Investment* (2019), https://perma.cc/UNR2-RZBK.

meaningful threat to investors, the SEC merely asserted that the available evidence fails to establish that "self-interest *cannot* be *a* significant motivating factor for share repurchases" or "undermine the proposition that personal benefit *may* be *a* factor in determining whether to undertake a share repurchase." Final Rule 17 (emphases added).

This reasoning improperly flipped the burden and requires vacating the Rule. The absence of evidence that a problem does *not* exist is not tantamount to evidence that it *does*. And absent *affirmative evidence* that improper motives actually factor into repurchase decisions, the Commission cannot "justif[y]" any "changes" to "current policy." *State Farm*, 463 U.S. at 42. Still less can it fulfill "its statutory obligation to assess the economic consequences of its rule." *Bus. Roundtable*, 647 F.3d at 1150. The Commission simply cannot substantiate a rule by pointing out that nobody has definitively disproven its rationale.

Consistent with that basic analytical error, the SEC's discussion of academic literature in the Rule's Economic Analysis never asserted that improperly motivated buybacks regularly occur. *See* Final Rule 110-17. Instead, the Commission merely noted disagreements without making any effort to resolve them. *See id.* That is not reasoned decisionmaking.

The SEC cannot meaningfully "assess the economic consequences of its rule" if it does not understand the scale of the economic problem it seeks to address. *Bus. Roundtable*, 647 F.3d at 1150. While it may be "difficult" to make a precise estimate of the proportion of buybacks resulting from executive misconduct, that "difficulty … does not excuse the Commission from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber*, 412 F.3d at 143. Instead, the SEC must "make tough choices about which of the competing [studies] is most plausible." *Bus. Roundtable*, 647 F.3d at 1150. Merely speculating that improper motives *could have some effect* is not enough.

**b.** Moreover, even if there were some evidence that improperly motivated buybacks were a serious problem, the SEC was not writing on a blank slate. Just months before issuing the rule here, the Commission adopted the rule *Insider Trading Arrangements and Related Disclosures*, 87 Fed. Reg. 80,362 (Dec. 29, 2022) (Insider Trading Rule), which targeted the overlapping problem of corporate insiders trading company stock to benefit themselves at the expense of shareholders. The SEC recognized that these two rules are interrelated, proposing both on the same day and explaining that they addressed "similar concerns." 87 Fed.

Reg. 8686, 8688 (Feb. 15, 2022); *see* Proposed Rule, 87 Fed. Reg. at 8466 (acknowledging the need to "coordinate the two releases"). Yet despite recognizing the close relationship between these rules, the Commission never considered whether and to what extent the Insider Trading Rule obviated the need for the additional disclosures of buybacks at issue here.

The SEC cannot simply ignore the effects of its Insider Trading Rule. In analyzing the economic effects of a rule, the Commission must "determine whether, under the existing regime, sufficient protections existed to enable investors to make informed investment decisions." *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 179 (D.C. Cir. 2010). And disregarding protections "the agency [itself] creates" through "a contemporaneous and closely related rulemaking"—as the Commission did here—is particularly unjustified. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011).

Specifically, the Insider Trading Rule adopted several new requirements addressing the same executive behavior the Buyback Rule purported to address. For example, to address the concern that "insiders" time their personal trading to immediately precede "repurchases or repurchase-plan announcements" and "adjust" the dates of such

announcements to increase "the returns on insider equity sales," Final Rule 15-16, the Insider Trading Rule imposes a "cooling-off period" to deter insiders from trading on "material nonpublic information" and "from improperly influencing the timing of corporate disclosures to benefit their trades." 87 Fed. Reg. at 80,380. And issuers have to disclose quarterly the "material terms" of any plans by insiders to trade in the issuer's stock, allowing the public to scrutinize whether insiders are engaged in improper trading. *Id.* at 80,382.

These requirements target the same conduct at issue here and thus ask whether and to what extent the Buyback Rule's mandates remain necessary or justified (to the extent they ever were). Yet the Commission never considered the issue, *see* Final Rule 19-26, 44-67, 102-29, rendering the Rule arbitrary on another basis.

**2.** The SEC likewise failed to substantiate the Rule's purported benefit of reducing information asymmetries between issuers and investors. According to the Commission, additional disclosures by issuers will benefit investors by "improving price discovery." Final Rule 109. Specifically, the Commission posited that additional disclosures will permit investors to better "infer[] the management's evolving beliefs

47

about the company's underlying value" and thereby come to a clearer understanding of its value themselves. *Id.* at 109. This analysis suffers from at least three independent flaws.

**a.** First and foremost, the SEC's reasoning on price discovery runs into a basic objection: existing disclosures and other publicly available information *already* make insiders' thinking on their buybacks sufficiently clear. *See id.* at 123, 128. The Commission's response to this objection is self-contradictory and inadequate.

When discussing the *benefit* of price discovery, the SEC claimed that the Rule would lead to the disclosure of material nonpublic information. According to the agency, companies rationally withhold valuable information about their repurchases because disclosure "can place an individual issuer at a relative disadvantage" to its competitors by allowing them to "infer proprietary information." *Id.* at 120-21. The SEC claims that compelling disclosure of this costly-to-reveal information will help investors properly value companies. *Id.* at 123.

Yet when discussing the *costs* of revealing proprietary information to competitors, the SEC asserted that companies would face only "relatively modest" burdens. *Id.* at 134. Why? Because it is unlikely

48

additional disclosures would "reveal[] significant proprietary information about the issuer's business and repurchase strategy, above and beyond competitive information that may be revealed by other disclosures" currently on the books. *Id.*

The Commission cannot have it both ways. Either the Rule requires the disclosure of important and meaningful information—or it does not. This sort of "internal inconsistency" is "characteristic of arbitrary and unreasonable agency action." *Chamber of Com. of U.S. v. DOL*, 885 F.3d 360, 382 (5th Cir. 2018); *see Bus. Roundtable*, 647 F.3d at 1148-49 (SEC acted arbitrarily because it "inconsistently and opportunistically framed the costs and benefits of the rule").

Even setting aside the Commission's self-contradiction, moreover, it essentially admitted that the supposed price-discovery benefit does not justify the rationale-disclosure requirement. The SEC acknowledged that the benefits of *that* requirement may be "limited" because investors are already "able to infer the purpose or structure of repurchases from other information" and that disclosures may provide "relatively little specificity to investors." Final Rule 128. In defense of the requirement, the SEC could assert only that this "more standardized" form of disclosure would

49

"giv[e] all investors equal access to this information." *Id.* That is, instead of lessening the gap between corporate insiders and outside investors, the rationale-disclosure requirement would simply make it easier for less sophisticated investors to process information that is already public. But even this modest rationale—not enough to support the requirement on its own—is arbitrary, as detailed below. *See infra* at 50-52.

**b.**     In response to the SEC's claim that the Rule would promote price discovery, the Chamber and other commenters pointed out that additional disclosures would likely *overwhelm* rather than *inform* retail investors. Final Rule 32; Comment II at 8-9. This is a serious concern. Burying investors "in an avalanche of trivial information … is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976). Conversely, it invites the bad-faith practice of hiding the needle of signal in the haystack of noise. Once again, the Commission's reply was unreasoned and internally inconsistent.

The SEC responded with two unpersuasive points. *First*, it claimed retail investors will avoid confusion because they can "collate th[e] daily data to another level of detail to suit their level of sophistication." Final Rule 55. The Commission cited no evidence for this point, and it defies

common sense. For this point to follow, retail investors would need to know that they should not look at *all* the data the SEC requires companies to make available and should instead examine it only at a *higher level of generality*. But knowing the appropriate level of detail at which to examine data *itself* requires sophistication that many retail investors lack. And this point *at most* shows that retail investors will be no *worse* off than under the current regime—*not* that they will be *better* off. This arbitrary reasoning reflects a "clear error of judgment" unsupported "by 'substantial evidence.'" *State Farm*, 463 U.S. at 43-44.

*Second*, and even worse, the Commission claims retail investors can simply rely on "intermediaries, such as investment advisers," to process the data for them. Final Rule 56. But if that is true, the SEC is wrong to say that additional disclosures will give all investors "equal access" to information that might otherwise be limited to sophisticated investors. *Id.* at 128. If sophisticated intermediaries like investment advisers are expected to be the primary processors of the information, then the Rule yields no benefit over current conditions. Nor does it promote "equal access" to require disclosure of information that is of use only to investors who can afford sophisticated intermediaries like investment advisors to

interpret it for them. Yet again, the SEC "inconsistently and opportunistically framed the costs and benefits of the rule." *Bus. Roundtable*, 647 F.3d at 1148-49.

**c.** Finally, even if there were information asymmetries that the Rule would lessen, the Commission *still* did not adequately "justif[y]" why this result is superior to "current policy." *State Farm*, 463 U.S. at 42. The SEC took for granted that reducing asymmetries is good while ignoring the countervailing costs.

As Professors White and Lewis explained, "asymmetric information is present in all market settings and can hardly be characterized as a market failure." Comment II Addendum 15. "Without some level of asymmetric information, there would be fewer incentives to invest in information collection, resulting in less price discovery." *Id.* That is, when prices "only partially" "reflect the information of informed individuals," there are greater incentives to "expend resources to obtain information" and "convey[]" it "to the uninformed." J. Grossman & J. Stiglitz, *On the Impossibility of Informationally Efficient Markets*, 70 Am. Econ. Rev. 393, 393 (1980). The SEC thus must do more than just identify information asymmetries to show a "market failure." Comment II Addendum 15-16.

The Commission responded to this point by attacking a strawman, noting that "informational asymmetries are not *necessary* to incentivize the production of information." Final Rule 51 (emphasis added). But Professors White and Lewis asserted there would be "fewer" incentives—not *zero* incentives—to collect information without asymmetric information. Comment II Addendum 15. The relevant question—which the SEC ignored—is whether reducing asymmetries disincentivizes information collection to the point that it causes investors to lose more informational benefits from disclosures than they gain.

The Commission also noted that certain "relevant information about stock repurchases" will remain "nonpublic" absent disclosures. Final Rule 51. But that just means an information asymmetry *exists*—not that remedying it would *benefit* investors. And it ignores the point, discussed above, that some asymmetries actually have positive effects. If managers have less incentive to discover valuable information in the first place, the end result may be less total valuable information for investors. Simply pointing out that investors might "benefit" from disclosed information does nothing to address that concern. *Id.*

The SEC further asserted that the Rule "will not eliminate *all* information asymmetries." *Id.* at 122 (emphasis added). Again, that is not enough. The Commission must "determine as best it can the economic implications of the rule it has proposed." *Chamber*, 412 F.3d at 143. To intelligently assess the Rule's costs and benefits, it must make an informed judgment about whether the decrease in a manager's incentives to obtain information undermines the benefits to investors of the additional information disclosed. *See* 15 U.S.C. § 78w(a)(2) (prohibiting unnecessary or inappropriate burdens on competition). By failing to make that judgment, the Commission simply refused to make the "tough choices" required to engage in the reasoned decisionmaking the law requires. *Bus. Roundtable*, 647 F.3d at 1150.

## C. The Commission Did Not Adequately Assess the Effect of the Recently Enacted Excise Tax on the Rule.

The Rule is also arbitrary because the Commission failed to sufficiently account for the effect of the newly-enacted 1% excise tax on stock repurchases. The Commission is required to assess its rules against "the existing regime," *Am. Equity*, 613 F.3d at 179, and assess costs and benefits "at the margin" of that regime. *Bus. Roundtable*, 647 F.3d at

1151. It must also "reexamine" its "approach[] 'if a significant factual predicate' changes." *Portland Cement*, 665 F.3d at 187. And yet despite recognizing the tax's importance during the rulemaking, *see supra* at 15, the SEC performed only a perfunctory analysis of it. That analysis is deficient in at least three respects.

*First*, the SEC did not adequately consider how the excise tax alters the Rule's economic effects. Although the Commission acknowledged that the tax would likely decrease repurchases, it deemed the Rule equally justified on the ground that its costs and benefits would decline equally in proportion with the number of buybacks. *See* Final Rule 107 (stating that "the effects of the excise tax are not expected to change the direction … of the economic effects of the [Rule] with respect to any particular share repurchase").

In making this determination, the SEC ignored its own admission that some of the Rule's costs are "fixed." *Id.* at 145. If the Rule's benefits and non-fixed costs decline with the level of repurchases while a portion of its costs remains constant, the *net* benefit of the Rule necessarily decreases and the Rule may no longer be warranted. *See* 15 U.S.C. § 78w(a)(2). The Chamber pointed this out, Comment V at 2-3, but the

SEC ignored it, *see* Final Rule 104-07. The Commission's failure to consider this issue was arbitrary. "An agency cannot ignore its prior factual findings that contradict its new policy," *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019), particularly when a commenter expressly brings those findings to its attention, *Huawei*, 2 F.4th at 449.

At most, the SEC noted that its staff had analyzed the tax in the "Staff Memorandum" the agency released when it reopened the comment period for the second time. Final Rule 107; *see supra* at 15. But the analysis in that Memorandum was itself arbitrary. To be sure, the Memorandum, unlike the Rule, acknowledged that the Rule has "fixed" *costs* that are likely to "comprise a larger portion" of total costs "following the excise tax." Staff Memorandum 12. But when it came to addressing the Rule's "fixed" *benefits*, the Memorandum simply asserted that they "*may* remain." *Id.* (emphasis added). This failure to even "hazard a guess" about the Rule's fixed benefits in the wake of the excise tax was arbitrary. *Bus. Roundtable*, 647 F.3d at 1150. By not making any definitive judgment on whether some portion of the Rule's benefits remained constant, the SEC and its staff arbitrarily failed to substantiate their conclusion that the excise tax did not alter the Rule's cost-benefit ratio.

*Second,* the Commission failed to adequately consider *which buybacks* the new excise tax would discourage. The Staff Memorandum surmised that while the tax might deter *improper* buybacks more than appropriate ones, it was "equally likely" that it would deter *all* buybacks, Staff Memorandum 11 n.37. To "determine as best it can the economic implications" of the Rule, the SEC had to determine whether the Rule would be justified even if the tax specifically deterred improper buybacks. *Chamber*, 412 F.3d at 143. The Commission had to make the "tough choice[]" of deciding which effect was actually more likely. *Id.* But it did not. *See* Final Rule 104-07.

*Finally*, the SEC failed to consider that its own changes to the Rule made the Staff Memorandum's analysis obsolete. The duty to "reexamine" "changes" to "a significant factual predicate" carries special force when "the agency" itself "creates" the change. *Portland Cement*, 665 F.3d at 187. Here, the Memorandum considered the effects of the tax on the *Proposed* Rule. Staff Memorandum 2. But the Final Rule replaced the Proposed Rule's *next-day* disclosure of data with *quarterly* disclosures. Final Rule 44. The SEC admits that this change materially decreased both the benefits and the costs of the Rule. *Id.* at 137, 147-48. But as

discussed above, the excise tax's effect on the Rule turns on the relative size of the Rule's fixed costs and purported benefits. Since some of those costs and benefits have changed, the SEC cannot just assume the ratio remains the same. Yet the agency failed to consider (let alone resolve) this issue. *See id.* at 106. This Court "simply cannot excuse [the Commission's] reliance on [] information" that "its own process" had "render[ed] [] irrelevant." *Portland Cement*, 665 F.3d at 187.

### D.    The Commission Did Not Reasonably Determine the Rule's Overall Effect.

Finally, even if the Commission had properly quantified and considered the Rule's costs and benefits *separately*, it did not reasonably assess their *combined* effect—yet another reason the rule is arbitrary. That is so in at least two respects.

*First*, the SEC did not reasonably account for the Rule's total costs when determining its overall economic effect. It determined that "[o]n balance," the Rule "may have positive overall effects on efficiency, competition, and capital formation." Final Rule 143. When it came to benefits, the SEC touted the Rule's supposed "decrease in the informational asymmetry between issuers and investors." *Id.* And while

the agency acknowledged the "indirect cost" of issuers "inefficiently decreas[ing] repurchases," it found this burden did not exceed the Rule's benefits because of the "mitigating factors" discussed "in Section V.C.1" of the Rule. *Id.* at 146. Section V.C.1, however, does not discuss *any* mitigating factors for this cost. *See id.* at 133-35. The SEC thus did not "reasonably explain[]" the Rule's net effect. *State Farm*, 463 U.S. at 42.

The Commission also noted that "the change to the frequency of reporting" from daily (in the Proposed Rule) to quarterly (in the Final Rule) "is likely [to] significantly alleviate" the loss of efficient repurchases "compared to the proposal." Final Rule 146. But the costs and benefits of a rule must be "justified" against "current policy," *State Farm*, 463 U.S. at 52, not proposed policy. The Commission cannot justify a wasteful rule merely by pointing out it was even more wasteful when first proposed.

The SEC's focus on the cost from foregone efficient repurchases was also unduly narrow. Its analysis of the Rule's overall effect did not account for the direct costs of completing the disclosures or other identified indirect costs, such as the exposure of proprietary information. *See* Final Rule 133-36, 143-46. The failure to consider these concededly "relevant factors" was also arbitrary. *State Farm*, 463 U.S. at 42.

*Second*, the Commission conceded that, insofar as it "affect[s] smaller issuers to a greater extent than larger issuers," the Rule "could result in adverse effects on competition." Final Rule 145. Having found a "burden on competition," the SEC could not "adopt" the Rule unless it further found the Rule was "necessary or appropriate in furtherance of the purposes" of the Securities and Exchange Act. 15 U.S.C. § 78w(a)(2).

The SEC made no such finding. *See* Final Rule 145-46. Instead, it again noted that the Final Rule's abandonment of daily reporting made it less burdensome than the Proposed Rule. *Id.* Even setting aside that such a response is inadequate on its own terms, *see supra* at 59, that response did not address the purposes of the Securities and Exchange Act, which is what the law requires. *Chamber*, 412 F.3d at 140.

\*   \*   \*

In its haste to get something—*anything*—out the door to address the perceived problem of share repurchases, the Commission violated the APA and its organic statutes many times over. Each of these deficiencies is sufficient to vacate the rule as arbitrary. Together, they provide a textbook example of how *not* to engage in reasoned decisionmaking. This Court should vacate the Rule in its entirety.

## III.   PETITIONERS LACKED A MEANINGFUL OPPORTUNITY TO COMMENT.

Finally, in addition to transgressing the First Amendment and committing a cascade of analytical errors, the Commission violated the APA's basic procedural requirements by failing to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). Under the APA, the "opportunity for comment" must be "a meaningful opportunity," *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009)—*i.e.*, "enough time with enough information to comment." *Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011). The use of short comment periods violates the APA where it is clear that comments "reflect the inability to comment meaningfully within this brief time." *Nat'l Lifeline Ass'n*, 921 F.3d at 1117; *see, e.g.*, *Prometheus*, 652 F.3d at 453 (28-day comment period rather than "usual 90 days"). Here, the SEC failed to provide commenters a meaningful opportunity to comment in at least three respects.

*First*, the SEC's initial 45-day comment period failed to provide a meaningful opportunity to study and comment on this complex, first-of-

its-kind rulemaking—let alone the rulemaking's interrelationship with numerous other significant and simultaneous rulemakings. Here, 45 days was not sufficient to parse the difficult empirical questions underlying share repurchases, especially given the numerous other SEC proposals undergoing comment simultaneously. *See, e.g.*, *Centro Legal De La Raza v. EOIR*, 524 F. Supp. 3d 919, 955 & n.26 (N.D. Cal. 2021) (agency violated the APA by providing only 60 days when there were multiple "overlapping comment periods" on interrelated rulemakings).[3]

The Chamber alerted the SEC to this problem just a week after it proposed the Rule, highlighting the numerous "overlapping" comment periods on "several complex rulemakings." Comment I at 5. The agency's Inspector General has likewise faulted the SEC for too many overlapping rulemakings, with "shortened public comment periods" and "shortened

---

[3] The Executive Branch has consistently acknowledged that comment periods shorter than 60 days raise red flags. *See* Exec. Order No. 12,866 (Clinton); Exec. Order No. 13,258 (Bush); Exec. Order No. 13,563 (Obama); 86 Fed. Reg. 7223 (Jan. 20, 2021) (Biden). And last year, Chairman Gensler committed before Congress to "always" give market participants "at least two months" to comment on SEC rule proposals. House Appropriations Subcomm. on Fin. Servs, *Hearing on the Fiscal Year 2023 SEC and Federal Trade Commission Budget Request* 7 (May 18, 2022).

timelines during the drafting process." SEC Office of Inspector General, *The Inspector General's Statement on the SEC's Management and Performance Challenges* 2-4 (2022), https://perma.cc/49EL-J7RY (noting the 26 new rules in the first 8 months of 2022 were "more than twice as many new rules as proposed the preceding year and more than it had proposed in each of the previous 5 years"). This rush to rulemaking has led to less "feedback during the rulemaking process," use of personnel with "little or no experience in rulemaking," "limit[ed] time available for staff research and analysis," and "increase[d] litigation risk." *Id.* at 3.

Multiple Commissioners also decried this rulemaking's rush. One noted his "extreme[] concern[] about the short comment period for this proposal," citing, among other things, the Rule's complexity and overlapping rulemakings. Comm'r Elad Roisman, *Dissenting Statement on Proposed Rules Regarding Share Repurchases* (Dec. 15, 2021), https://perma.cc/F5WC-2EFU. Another cited the Proposed Rule as an example of a rule the agency "plans to rush to completion ... in which commenters have identified deep flaws." Comm'r Hester Peirce, *Rip Current Rulemakings: Statement on the Regulatory Flexibility Agenda* n.25 (June 22, 2022), https://perma.cc/BY4K-BQBF. And the Commission

itself has recognized that "a combination of the significance and complexity of the rules and the overlap of the comment period with the comment periods of other significant, interrelated rules" may make it "impossible to meaningfully comment." SEC Summ. J. Br. 28, *Chamber of Commerce of the U.S. v. SEC*, No. 3:22-cv-0561 (M.D. Tenn. Nov. 4, 2022), Dkt. No. 61. In the face of all this, the SEC merely asserted it did "not believe an additional extension of the comment period is necessary." Final Rule 8.

*Second,* exacerbating the problems with this pell-mell pace, it turned out that the SEC's system for receiving comments was not accepting "a number of" them during a period spanning the entirety of the initial comment period. 87 Fed. Reg. at 63,016. From June 2021 to August 2022, 11 rulemakings and one request for comment suffered "a technological error" in which "a number of public comments submitted through the [SEC's] internet comment form were not received." *Id.* Although the Commission reopened the comment period for less than a month solely to allow "resubmission" of any comments lost to the void, *id.*, this blunder highlights the substantive risks inherent in such rushed decisionmaking.

*Finally,* the SEC's second reopening of the comment period on December 12, 2022—a reopening one Commissioner described as "especially problematic"—compounded these errors and created a new one. Comm'r Mark Uyeda, *Statement on Reopening of Comment Period for Share Repurchase Disclosure Modernization* (Dec. 7, 2022), https://perma.cc/LFE5-Y6WM. Despite recognizing that the new excise tax would have meaningful impacts on the Proposed Rule, the SEC gave just 30 days to comment on that tax and the new Staff Memorandum discussing it. *Supra* at 15. And that Memorandum was "devoid of quantitative analysis, forcing commenters to start from scratch." Comment V at 2. The abbreviated comment period of just half the usual 60 days, which could not have been predicted by commenters, also spanned "the year-end holidays," *Pangea Leg. Servs. v. DHS*, 501 F. Supp. 3d 792, 819 (N.D. Cal. 2020), and proceeded (again) in parallel with a "slew of interrelated rulemaking activity," *Cath. Legal Immigr. Network, Inc. v. EOIR*, No. 21-cv-94, 2021 WL 3609986, at *3 (D.D.C. Apr. 4, 2021).

These abbreviated comment periods not only increased the likelihood of SEC staff errors, but also prevented commenters, including the Chamber, from submitting the kinds of comprehensive comments

they would have submitted if given an appropriate amount of time. Quaadman Decl. ¶ 7. As Professors Lewis explains, he would have conducted more quantitative analysis that would have helped the agency weigh the Proposed Rule's costs and benefits if he had the typical 60 days to do so. Lewis Decl., Ex. C, ¶¶ 4-7. Instead, the truncated start-stop comment periods forced him to forgo methodologies and subjects that would have aided the SEC's consideration of its proposal.

These procedural deficiencies were especially harmful because the Commission has a special duty to apprise itself of the economic consequences of its rules and hence to quantify the effects of its rules where feasible. *See supra* at 37-39. Both the Proposed Rule and the *Excise Tax Reopening* state that the SEC lacked the data to do this and encouraged commenters to supply it. 87 Fed. Reg. at 8451; *id.* at 75,977. Yet rather than give commenters an appropriate amount of time to do so, the Commission curtailed its typical deadlines.

At bottom, the disjointed and abbreviated comment periods here were simply not enough. These procedural errors provide yet another reason to set aside the Final Rule, as well as perhaps some explanation for the Rule's numerous, basic analytical flaws. *See supra* Parts I-II.

## CONCLUSION

This Court should vacate the Final Rule, or at least its rationale-disclosure and daily-data requirements.

Dated: July 3, 2023

Respectfully submitted,

Tara S. Morrissey
Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, N.W.
Washington, DC 20062
(202) 463-5337

*/s/ Noel J. Francisco*
Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Charles E.T. Roberts
Ryan M. Proctor
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

Alexander V. Maugeri
JONES DAY
250 Vesey St.
New York, NY 10281
(212) 326-3939

*Counsel for Petitioners*

# CERTIFICATE OF SERVICE

I certify that on July 3, 2023, I served a copy of the foregoing on all counsel of record by CM/ECF.

Dated: July 3, 2023

*/s/ Noel J. Francisco*
Noel J. Francisco
*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume, typeface, and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) & (7)(B), and Fifth Circuit Rule 32.1 & 32.2. Excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, the brief contains 12,907 words and was prepared using Microsoft Word and produced in Century Schoolbook Standard 14-point font.

Dated: July 3, 2023

*/s/ Noel J. Francisco*
Noel J. Francisco
*Counsel for Petitioners*

# EXHIBIT A

## DECLARATION OF THOMAS QUAADMAN

1.     My name is Thomas Quaadman.  I am the Executive Vice President of the Center for Capital Markets Competitiveness (CCMC) at the Chamber of Commerce of the United States of America.  In that capacity, I oversee all of CCMC's operations. CCMC works to advance America's global leadership in capital formation by supporting diverse capital markets that are the most fair, transparent, efficient, and innovative in the world.  CCMC advocates on behalf of American businesses to ensure that legislation and regulation strengthen our capital markets, thus allowing businesses—from the local flower shop to a multinational manufacturer—to mitigate risks, manage liquidity, access credit, and raise capital.  I direct the Chamber's work on corporate governance, and I have also testified on several occasions before congressional committees on issues covering capital formation, financial reporting, and corporate governance.

2.     I am over 18 years old.  This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the Chamber.  If called as a witness, I could and would testify competently thereto.

### The Chamber and Its Mission

3.     The Chamber is the world's largest business federation, representing approximately 300,000 direct members, some of whom are also members of Petitioner the Texas Association of Business and Petitioner the Longview Chamber of Commerce. The U.S. Chamber represents the interests of its members nationwide, who, in turn, represent more than three million U.S. businesses and professional organizations of every size and in every economic sector and geographic region of the country.

4.     The Chamber's mission, which it has advanced for more than 100 years, is to advocate for policies designed to help businesses create jobs and grow the national economy.  The

Chamber furthers this mission through leading pro-business initiatives on legislation and regulation, and to this end, regularly brings litigation against federal, state, and local governments to challenge government action that harms its members, such as its current challenge to *Share Repurchase Disclosure Modernization*, Release No. 34-97424 (May 3, 2023) (Final Rule or Buyback Rule).

### The Buyback Rule's Truncated Comment Window

5.    The Buyback Rule was proposed as part of a flurry of interrelated SEC rulemakings. On the same day it proposed the Buyback Rule, the Commission also proposed *Insider Trading Arrangements and Related Disclosures*, 87 Fed. Reg 8686 (Feb. 15, 2022) (Insider Trading Rule), which addressed the many of the same concerns about purported executive misconduct as the Buyback Rule. The Buyback Rule's comment period also overlapped with comment periods for the proposed rules *Pay Versus Performance*, 87 Fed. Reg. 5751 (Feb. 2, 2022), *Prohibition Against Fraud, Manipulation, or Deception in Connection With Security-Based Swaps*, 87 Fed. Reg. 6652 (Feb. 4, 2022), and *Money Market Fund Reforms*, 87 Fed. Reg. 7248 (Feb. 8, 2022).

6.    Despite this flurry of concurrent rulemakings, the Commission allowed interested parties only 45 days to comment on the Buyback Rule. *See* 87 Fed. Reg. 8443 (Feb. 15, 2022). This marked a stark departure from the Commission's historic practice of allowing 60 days to comment on standard rules, and 90 or 120 days for complex rules like the Buyback Rule.

7.    All five of the proposed rules affected the interests of the Chamber's members, prompting the Chamber to expend time and resources analyzing them and preparing comments. The simultaneous rulemakings, together with the truncated periods in which to comment, divided the Chamber's attention, preventing the Chamber from providing as thorough of an analysis in its

comments on the Buyback Rule as it otherwise would. In particular, had the comment window for the Buyback Rule been longer, the Chamber would have devoted more attention in its comments to the interplay between the Insider Trading Rule and the Buyback Rule and to analyzing the agency's cost-benefit analysis.

### The Buyback Rule's Effects on the Chamber's Members

8.     International Bancshares Corporation (IBC) is a direct member of the Chamber. It is a multi-bank financial holding company headquartered in Laredo, Texas, with 167 facilities and 259 ATMs serving 75 communities in Texas and Oklahoma. IBC is publicly traded on the Nasdaq index under the listing IBOC.

9.     Like many of the Chamber's members, IBC regularly returns profits and surplus capital to its shareholders by repurchasing its stock. Since April 2009, IBC's Board of Directors has approved a formal stock repurchase program that authorizes the repurchase of IBC common stock within the following 12 months. For example, on February 23, 2022, IBC's Board of Directors authorized a repurchase program to purchase up to $150 million of IBC's common stock during the 12-month period commencing on March 15, 2022. In December 2022, IBC's Board of Directors again authorized a repurchase program to purchase up to $124 million of IBC's common stock during the 12-month period commencing on March 16, 2023. Such shares may be purchased from time to time on the open market or through privately negotiated transactions. Shares repurchased are held in treasury for reissue for various corporate purposes, including employee compensation plans. As disclosed in its public filings, IBC implements its repurchase programs through the periodic adoption of Rule 10b-18 and a Rule 10b5-1 trading plans, which IBC intends to continue adopting and which allow IBC to purchase shares of its common stock during certain open and blackout periods when it ordinarily would not be in the market due to trading restrictions

in its insider trading policy. During the terms of both a Rule 10b-18 and a Rule 10b5-1 trading plan, purchases of IBC's common stock are automatic to the extent the conditions of the plan's trading instructions are met. As of February 17, 2023, a total of 13,584,730 shares had been repurchased under all programs at a cost of $409,820,000. IBC is not obligated to purchase shares under its stock repurchase program outside of the Rule 10b-18 and Rule 10b5-1 trading plans.

10.    IBC currently discloses aggregate information about its share purchases on a quarterly basis in Form 10-Q and annually in Form 10-K. IBC does not currently disclose its reasons for repurchasing its shares or detailed analysis about daily trading activity.

11.    If the new rule on "Share Repurchase Disclosure Modernization" issued by the Securities and Exchange Commission (SEC) takes effect, many of the Chamber's members, including IBC, will be forced to increase their disclosures. Specifically, they will have to report each share repurchase on a daily basis the quarter after it occurs and disclose each quarter the objective or rationale for their repurchases. This will harm the Chamber's members, including IBC, in several ways.

12.    First, the new rule will compel them to speak against their will. These companies will be forced to disclose, among other things, what are often controversial business decisions and the reasons underlying them. IBC, for example, does not wish to reveal these matters and would not do so but for the coercive effect of the rule.

13.    Second, the new rule will impose compliance costs on them. Companies will have to devote staff time and other resources to compiling and reporting daily disclosure data, including training counsel to prepare the new forms. Most companies do not presently gather and aggregate repurchase information on a daily basis, so they will have to develop a process for doing so. Management and counsel will also have to spend time determining how to characterize the

company's "objective rationale" for making each individual purchase and the "process or criteria used to determine the amount of repurchases," especially as the rule requires that "the narrative disclosure" be "sufficiently detailed" and "appropriately tailored to an issuer's particular facts and circumstances." Final Rule 67, 78.

14.    Third, the costs discussed above will have the additional consequence of making share repurchases more expensive. Each repurchase will result in additional compliance costs of the kind discussed above. If share repurchases are costlier, they will be fewer and smaller. And because share repurchases generally increase a company's value, the ultimate result of the new requirements will be to undervalue publicly traded companies.

15.    IBC does not see how it could ever recover these costs in the future. Compelled speech cannot be unsaid. Disclosed information cannot be made secret again. Time and effort spent complying cannot be brought back. And monetary compensation cannot be obtained from the SEC due to sovereign immunity.

16.    IBC's compliance costs will be substantial. Last year, IBC repurchased approximately 1,297,100 of its shares of common stock for approximately $51,875,000, executing repurchases on a total of 52 days. As of May 22, 2023, IBC has repurchased approximately 108,100 of its shares of common stock for approximately $4,396,200, executing repurchases on a total of 11 days. IBC estimates that if it had been subject to the SEC's rule during that time, it would have incurred thousands of dollars in direct compliance costs. Moreover, if IBC had been subject to the rule during that time, it would potentially have exposed itself to reputational and legal risks and associated costs by having to comply with the "objective rationale" disclosure requirement.

17.    IBC is not alone.  Thousands of U.S. firms, more than 350 of which are members of the Chamber, use share repurchases to return profits and surplus capital to shareholders.  If the SEC's new rule goes into effect, these firms will incur similar costs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed on June **28**, 2023, at Washington, D.C.

Tom Quaadman

# EXHIBIT B

## DECLARATION OF GLENN HAMER

1.    My name is Glenn Hamer.  I am the President and CEO of the Texas Association of Business (TAB).  TAB is a general business association and state chamber of commerce.  TAB represents member companies, large and small, to advocate for a policy, legal, and regulatory environment that allows them to thrive in business.

2.    I am over 18 years old.  This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of TAB.  If called as a witness, I could and would testify competently thereto.

3.    TAB, the state chamber, was established in 1922 by three San Antonio businessmen: G.M. Kneibel, G.G. Geyer, and I.M. McIlhenny.  Since then, TAB has worked alongside business and its chamber partners to represent companies of all sizes and sectors, advocating for pro-business policies.  TAB's principal place of business is 316 West 12th Street #200, Austin, TX 78701.

4.    TAB works in a bipartisan manner to vigorously protect Texas' pro-business climate, delivering solutions to the challenges affecting Texas employers and fighting against excessive, burdensome, or unnecessary regulations.

5.    TAB's purpose is to champion the best business climate in the world, unleashing the power of free enterprise to enhance lives for generations.

6.    International Bancshares Corporation (IBC) is a direct member of TAB.  It is a multi-bank financial holding company headquartered in Laredo, Texas, with 167 facilities and 259 ATMs serving 75 communities in Texas and Oklahoma.  IBC is publicly traded on the Nasdaq index under the listing IBOC.

7.     Like many of TAB's members, IBC regularly returns profits and surplus capital to its shareholders by repurchasing its stock. Since April 2009, IBC's Board of Directors has approved a formal stock repurchase program that authorizes the repurchase of IBC common stock within the following 12 months. For example, on February 23, 2022, IBC's Board of Directors authorized a repurchase program to purchase up to $150 million of IBC's common stock during the 12-month period commencing on March 15, 2022. In December 2022, IBC's Board of Directors again authorized a repurchase program to purchase up to $124 million of IBC's common stock during the 12-month period commencing on March 16, 2023. Such shares may be purchased from time to time on the open market or through privately negotiated transactions. Shares repurchased are held in treasury for reissue for various corporate purposes, including employee compensation plans. As disclosed in its public filings, IBC implements its repurchase programs through the periodic adoption of Rule 10b-18 and a Rule 10b5-1 trading plans, which IBC intends to continue adopting and which allow IBC to purchase shares of its common stock during certain open and blackout periods when it ordinarily would not be in the market due to trading restrictions in its insider trading policy. During the terms of both a Rule 10b-18 and a Rule 10b5-1 trading plan, purchases of IBC's common stock are automatic to the extent the conditions of the plan's trading instructions are met. As of February 17, 2023, a total of 13,584,730 shares had been repurchased under all programs at a cost of $409,820,000. IBC is not obligated to purchase shares under its stock repurchase program outside of the Rule 10b-18 and Rule 10b5-1 trading plans.

8.     IBC currently discloses aggregate information about its share purchases on a quarterly basis in Form 10-Q and annually in Form 10-K. IBC does not currently disclose its reasons for repurchasing its shares or detailed analysis about daily trading activity.

9. If the new rule on "Share Repurchase Disclosure Modernization" issued by the Securities and Exchange Commission (SEC) takes effect, many of TAB's members, including IBC, will be forced to increase their disclosures. Specifically, they will have to report each share repurchase on a daily basis the quarter after it occurs and disclose each quarter the objective or rationale for their repurchases. This will harm TAB's members, including IBC, in several ways.

10. First, the new rule will compel them to speak against their will. These companies will be forced to disclose, among other things, what are often controversial business decisions and the reasons underlying them. IBC, for example, does not wish to reveal these matters and would not do so but for the coercive effect of the rule.

11. Second, the new rule will impose compliance costs on them. Companies will have to devote staff time and other resources to compiling and reporting daily disclosure data, including training counsel to prepare the new forms. Most companies do not presently gather and aggregate repurchase information on a daily basis, so they will have to develop a process for doing so. Management and counsel will also have to spend time determining how to characterize the company's "objective rationale" for making each individual purchase and the "process or criteria used to determine the amount of repurchases," especially as the rule requires that "the narrative disclosure" be "sufficiently detailed" and "appropriately tailored to an issuer's particular facts and circumstances." Final Rule 67, 78.

12. Third, the costs discussed above will have the additional consequence of making share repurchases more expensive. Each repurchase will result in additional compliance costs of the kind discussed above. If share repurchases are costlier, they will be fewer and smaller. And because share repurchases generally increase a company's value, the ultimate result of the new requirements will be to undervalue publicly traded companies.

13.    IBC does not see how it could ever recover these costs in the future.  Compelled speech cannot be unsaid.  Disclosed information cannot be made secret again.  Time and effort spent complying cannot be brought back.  And monetary compensation cannot be obtained from the SEC due to sovereign immunity.

14.    IBC's compliance costs will be substantial.    Last year, IBC repurchased approximately 1,297,100 of its shares of common stock for approximately $51,875,000, executing repurchases on a total of 52 days.  As of May 22, 2023, IBC has repurchased approximately 108,100 of its shares of common stock for approximately $4,396,200, executing repurchases on a total of 11 days.  IBC estimates that if it had been subject to the SEC's rule during that time, it would have incurred thousands of dollars in direct compliance costs.  Moreover, if IBC had been subject to the rule during that time, it would potentially have exposed itself to reputational and legal risks and associated costs by having to comply with the "objective rationale" disclosure requirement.

15.    IBC is not alone.  Scores of Texas firms, over 50 of which are members of the TAB, use share repurchases to return profits and surplus capital to shareholders.  If the SEC's new rule goes into effect, these firms will incur similar costs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 29 2023, at Austin, Texas.

Glenn Hamer

# EXHIBIT C

## DECLARATION OF CRAIG M. LEWIS

1.      My name is Craig M. Lewis.  I am the Madison S. Wigginton Professor of Finance at the Owen Graduate School of Management of Vanderbilt University and a Professor of Law at Vanderbilt Law School.

2.      I am over 18 years old.  This Declaration is based upon my personal knowledge and belief.  If called as a witness, I could and would testify competently thereto.

3.      A colleague, Professor Joshua T. White, and I contributed to the U.S. Chamber of Commerce's comments on the proposed version of the Rule, but it was challenging to submit comments during the limited comment periods, which overlapped with comment periods on other major rulemakings.  Those comment periods ran from February 15, 2022 to April 1, 2022; from October 18, 2022 to November 1, 2022; and from December 7, 2022 to January 6, 2023.  Professor White and I authored a report in Fall 2021 on Corporate Liquidity Provision & Share Repurchase Programs, as well as March 2022 and January 2023 addenda to that report (together, the "Report").  The Report was submitted to the SEC with the Chamber's comments on the proposed version of the Rule.

4.      Our Report was unable to reflect the full range of concerns we had with the proposed Rule or the full analyses we wanted to provide the agency for its consideration before finalizing the Rule.  In particular, we believed that there were obvious empirical analyses we could have conducted if given more time.  But we chose to offer them as suggestions for the Commission to consider, rather than doing them ourselves, because of the constrained comment periods.  One suggestion that could have been analyzed with more time was whether the earnings accretion attributable to share repurchase activity would have allowed managers to earn earnings bonuses they would not have been entitled to otherwise.

5.      The SEC's approach to the comment periods here reduced our ability to contribute substantive information to the agency's analysis, primarily because the comment periods were too short .

6.      The first comment period was just 45 days, whereas the kinds of analyses we believe would have benefitted the agency's consideration of the proposed Rule would have required a comment period of 60 days.

7.      The second comment period, which we had no reason to expect would be opened beforehand, was just 14 days.

8.      In the final Rule, the SEC failed to provide any explanation for the short timeframe for commenting, especially given the broad nature of the rule, the lack of urgency, and the agency's unusually busy rulemaking agenda.  Had the agency provided more time to comment on the proposed Rule, we would have been able to provide more comprehensive analyses and data to help inform the SEC's consideration before finalizing the Rule.  Because the SEC insisted on proceeding with this rule on a truncated timetable, the record before the agency is incomplete.

9.      The SEC's strategy of responding to comments that identify gaps in the economic analysis by adding additional data analyses to the public comment file, as it recently did with the "Supplemental Data and Analysis on Certain Economic Effects of Proposed Amendments Regarding the Reporting of Beneficial Ownership" and the "Supplemental Data and Analysis Regarding the Proposed Reporting Thresholds in the Equity Security-Based Swap Market" reflects the hurried pace of the Commission's rulemaking agenda and is a poor substitute for thorough initial analysis of the proposed rule's economic effects.[1]

---

[1] Memorandum of the Staff of the Division of Economic and Risk Analysis, Supplemental data and analysis on certain economic effects of proposed amendments regarding the reporting of beneficial ownership (Apr. 28, 2023), available at https://www.sec.gov/comments/s7-06-22/s70622.htm was placed in the public comment file to support the proposed Modernization of Beneficial Ownership Reporting, Release No. 34-94211 (Feb. 10,

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 29, 2023, at Nashville, Tennessee.

Craig M. Lewis

---

2022), 87 FR 13846, (Mar. 10, 2022).  Memorandum of the Staff of the Division of Economic and Risk Analysis, Supplemental data and analysis regarding the proposed reporting thresholds in the equity security-based swap market (June 20, 2023), available at https://www.sec.gov/comments/s7-32-10/s73210-207819-419422.pdf was placed in the public comment file to support the proposed Position Reporting of Large Security-Based Swap Positions, Release No. 34-93784, (Dec. 15, 2021)