No. 23-60255

---

**United States Court of Appeals for the Fifth Circuit**

—————————————

Chamber of Commerce of the United States of America, et al.,
*Petitioners*,

v.

United States Securities and Exchange Commission, et al.,
*Respondent.*

—————————————

Petition for Review of an Order of
the Securities and Exchange Commission
Release Nos. 34-97424; IC-34906

—————————————

**Brief of the State of Utah and 14 Other States as
*Amici Curiae* in Support of Petitioners**

—————————————

Christopher A. Bates
Deputy Solicitor General
Office of the Utah Attorney General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
(801) 538-9600
chrisbates@agutah.gov

*Counsel for Amici Curiae*

[Additional Counsel listed at end of brief]

## Supplemental Statement of Interested Parties

*Amici Curiae* are governmental parties. Under Fifth Circuit Rule 28.2.1, a certificate of interested persons is not required.

# Table of Contents

Supplemental Statement of Interested Parties ......................... i

Table of Authorities ........................................... iii

Identity and Interest of *Amici Curiae* ......................... 1

Introduction and Summary of Argument .......................... 2

Argument ...................................................... 3

    I.    Stock buybacks provide substantial benefits for both retail and institutional investors, including state pension and retirement funds. ........................................................ 3

    II.   By making stock buybacks a less attractive means of returning value to shareholders, the Final Rule will harm investors and the public at large. .................................... 12

Conclusion .................................................... 16

Additional Counsel ............................................ 18

Certificate of Compliance ..................................... 19

Certificate of Service ........................................ 19

# Table of Authorities

## Rules

Federal Rule of Appellate Procedure 29......................................................... 1

## Regulations

*Share Repurchase Disclosure Modernization*,
  88 Fed. Reg. 36,002 (June 1, 2023) ........................................2, 13, 14, 15

## Other Authorities

Alex Edmans, *The Case for Stock Buybacks*, Harv. Bus. Rev. (Sept.
  15, 2017), https://hbr.org/2017/09/the-case-for-stock-buybacks......... 4, 9

Comment of Chris Netram, Nat'l Ass'n of Mfrs., SEC File No. S7-21-
  21, Share Repur*chase Disclosure Modernization* (Apr. 1, 2022),
  https://www.sec.gov/comments/s7-21-21/s72121-20122035-
  275416.pdf ............................................................................................ 16

Comment of Davis Polk & Wardwell LLP, SEC File No. S7-21-21,
  *Share Repurchase Disclosure Modernization* (Mar. 28, 2022),
  https://www.sec.gov/comments/s7-21-21/s72121-20121498-
  273485.pdf ....................................................................................8, 9, 14

Comment of Gene Barr, Pa. Chamber of Bus. & Indus., SEC File No.
  S7-21-21, *Share Repurchase Disclosure Modernization* (Apr. 1,
  2022), https://www.sec.gov/comments/s7-21-21/s72121-20122173-
  278209.pdf .............................................................................................. 9

Comment of Maria Ghazai, Bus. Roundtable, SEC File No. S7-21-21,
  *Share Repurchase Disclosure Modernization* (Apr. 1, 2022),
  https://www.sec.gov/comments/s7-21-21/s72121-20122223-
  278256.pdf ............................................................................................ 15

Comment of Ted Allen & Darla Stuckey, Soc'y for Corp. Governance,
  SEC File No. S7-21-2*1, Share Repurchase Disclosure
  Modernizat*ion (Apr. 1, 2022), https://www.sec.gov/comments/s7-21-
  21/s72121-20122366-278395.pdf................................................6, 8, 9, 13

Comment of Tom Quaadman, U.S. Chamber of Commerce, Att. 2,
  SEC File No. S7-21-21, *Share Repurchase Disclosure
  Modernization* (Apr. 1, 2022), https://www.sec.gov/comments/s7-21-
  21/s72121-20122665-278649.pdf............................................................ 6

Craig M. Lewis & Joshua T. White, *Corporate Liquidity Provision and Share Repurchase Programs* (2021), https://www.centerforcapitalmarkets.com/wp-content/uploads/2021/09/CCMC_Stock-Buybacks_WhitePaper_10.2.21.pdf ............................................... passim

Daniel J. Hemel & Gregg D. Polsky, *Taxing Buybacks*, 38 Yale J. Reg. 246, 296 (2021) ........................................................................ 11, 12

David Ikenberry et al., *Market underreaction to open market share repurchases*, 39 J. Fin. Econ. 181 (1995) .................................................. 4

Erica York, Tax Found., *The Economics of Stock Buybacks* (Sept. 19, 2018), https://taxfoundation.org/economics-stock-buybacks .................. 7

Investopedia, *Income Tax vs. Capital Gains Tax: Differences* (Jan. 12, 2023), https://www.investopedia.com/ask/answers/052015/what-difference-between-income-tax-and-capital-gains-tax.asp .................. 10

Jesse M. Fried & Charles C.Y. Wang, *Are Buybacks Really Shortchanging Investment?*, Harv. Bus. Rev. (Mar.-Apr. 2018), https://hbr.org/2018/03/are-buybacks-really-shortchanging-investment ............................................................................................ 7, 8

SEC, Response to Congress: Negative Net Equity Issuance (Dec. 23, 2020), https://www.sec.gov/files/negative-net-equity-issuance-dec-2020.pdf ..................................................................................... 4, 5, 6, 7

## Identity and Interest of *Amici Curiae*

*Amici Curiae*, the States of Utah, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Montana, New Hampshire, Ohio, Oklahoma, and South Carolina are authorized to file this brief under Federal Rule of Appellate Procedure 29(a)(2).

*Amici* States have a strong interest in promoting a healthy, efficient economy for their residents and for companies doing business in their state. *Amici* States also have a strong interest in supporting the financial success of their state pension and retirement funds, which collectively benefit millions of *Amici* States' citizens. And *Amici* States have an interest in promoting economically sound market conditions for their millions of residents who are retail investors—everyday Americans who buy and sell stock through brokers or retirement accounts.

*Amici* States submit this brief in support of Petitioners because stock buybacks are an important, economically beneficial way companies return value to shareholders and reallocate capital. Corporate governance traditionally is a matter of state, not federal regulation, and *Amici* States oppose inefficient, burdensome regulations on stock buybacks because buybacks benefit investors and the public at large. By

incentivizing companies to seek other, less productive outlets for excess cash, the Final Rule will harm investors and reduce returns for state pension and retirement funds. In short, it will leave *Amici* States and their residents less well off. *Amici* States accordingly urge the Court to vacate the Final Rule.

### Introduction and Summary of Argument

Stock buybacks are one of the two primary ways companies return excess cash to shareholders. The other is dividends. Stock buybacks provide a range of benefits, such as increasing investor returns, improving market liquidity, reducing market volatility, and enabling more efficient allocation of capital. Research has found that buybacks save investors hundreds of millions of dollars a year by providing price stability and lowering downside risk. They also enable shareholders to redirect investment to smaller companies that need capital to grow their business.

The Commission's recent rule imposing new mandatory disclosure requirements for stock buybacks, *Share Repurchase Disclosure Modernization*, 88 Fed. Reg. 36,002 (June 1, 2023) ("Final Rule"), threatens these benefits. The Final Rule will make buybacks less

attractive to companies with excess cash by forcing companies that engage in buybacks to publicly disclose their strategy and thinking behind their buyback decisions. Revealing such information may provide competitors important insights or provide fodder for shareholder suits, thereby making buybacks a riskier strategy than other options for redirecting excess cash. Yet those other options, such as dividends or new acquisitions, may also be less economically efficient or less likely to create growth. The result will be reduced returns to investors and less economic growth.

The Commission's goal should be to *spur* growth and enable investors to put their capital toward increasingly productive uses, not erect new barriers that cause the opposite. Yet the Final Rule erects just those sorts of barriers. It will harm investors and hinder companies' ability to efficiently reallocate capital. This Court should vacate the Rule.

## Argument

### I. Stock buybacks provide substantial benefits for both retail and institutional investors, including state pension and retirement funds.

Extensive research has documented numerous ways in which stock buybacks benefit investors and the public at large. These benefits

include, but are not limited to, increasing investor returns, improving market liquidity, reducing market volatility, enabling more efficient allocation of capital, and allowing companies to provide equity compensation without diluting share value. Stock buybacks also provide important advantages over dividends. These benefits extend to all types of investors, including retail investors and the pension and retirement funds states provide their employees.

To start, stock buybacks increase investor returns. Research shows that share prices tend to increase in response to buyback announcements and earn greater-than-expected returns over the following one-to-two years. SEC, Response to Congress: Negative Net Equity Issuance, at 10 (Dec. 23, 2020) ("SEC 2020 Report"), https://www.sec.gov/files/negative-net-equity-issuance-dec-2020.pdf. One study found that the average above-expected return on shares following a buyback announcement is 12.1 percent. Alex Edmans, *The Case for Stock Buybacks*, Harv. Bus. Rev. (Sept. 15, 2017), https://hbr.org/2017/09/the-case-for-stock-buybacks (citing David Ikenberry et al., *Market underreaction to open market share repurchases*, 39 J. Fin. Econ. 181 (1995)). Importantly, "[t]his announcement effect does not dissipate over time, as one would expect if

repurchases were based on efforts to manipulate share prices." SEC 2020 Report at 19.

Stock buybacks also improve market liquidity and reduce market volatility. When a company announces a stock buyback, the company "effectively notifies investors that it plans to open a window when investors can be reasonably confident that they can liquidate positions without being unduly concerned about negative price impact." Craig M. Lewis & Joshua T. White, Corporate Liquidity Provision and Share Repurchase Programs, at 9 (2021), https://www.centerforcapitalmarkets. com/wp-content/uploads/2021/09/CCMC_Stock-Buybacks_WhitePaper_ 10.2.21.pdf. This enhances liquidity by enabling buyers and sellers to transact quickly with less price impact. *Id.* at 5. It likewise reduces volatility by implicitly setting a price floor "at the current market price." *Id.* at 9; *see also id.* at 5 (explaining how buybacks provide "price support during periods when selling pressure is relatively high").

According to research by two Vanderbilt University finance professors, over a 17-year period from 2004 to 2020, these liquidity-enhancing and volatility-reducing benefits of stock buybacks saved retail

investors between $2.1 and 4.3 billion. *Id.* at 3, 5.[1] The professors found "substantial evidence that managers strategically use share repurchase programs to stabilize stock price and provide liquidity during periods of uncertainty" and that "[t]hese activities mitigate share price declines and benefit the firm's investors by reducing transaction costs and reducing downside liquidity risk." *Id.* at 11. These effects are likely to be particularly strong for smaller companies with lower market capitalization, as they "often have less liquidity." Comment of Ted Allen & Darla Stuckey, Soc'y for Corp. Governance, at 7, SEC File No. S7-21-21, *Share Repurchase Disclosure Modernization* (Apr. 1, 2022) ("Allen & Stuckey Comment"), https://www.sec.gov/comments/s7-21-21/s72121-20122366-278395.pdf.

Next, stock buybacks enable more efficient capital allocation. As the Commission's staff has explained, "[s]ometimes companies that have excess cash do not have profitable investment opportunities." SEC 2020 Report at 27. When this occurs, rather than "spend the cash in sub-

---

[1] Commenters provided a copy of this study to the Commission during the comment period on the proposed rule. *See* Comment of Tom Quaadman, U.S. Chamber of Commerce, Att. 2, SEC File No. S7-21-21, *Share Repurchase Disclosure Modernization* (Apr. 1, 2022), https://www.sec.gov/comments/s7-21-21/s72121-20122665-278649.pdf.

optimal ways, such as empire-building acquisitions," *id.* at 28, companies may choose to return the cash to shareholders through buybacks. Shareholders can then use the returned capital to invest in other companies that are seeking to grow their business or innovate and that need additional resources to achieve those goals. As one expert has described, "[b]y engaging in stock buybacks, larger, established firms free up cash that can be used for more productive purposes elsewhere, such as investment in innovative and quickly growing small firms." Erica York, Tax Found., *The Economics of Stock Buybacks* (Sept. 19, 2018), https://taxfoundation.org/economics-stock-buybacks.

The benefits of more efficient capital allocation from stock buybacks extend broadly. According to one study, between 2007 and 2016, publicly traded companies outside the S&P 500 took in over $400 billion *more* from shareholders than they paid out, indicating that "a good portion of the net shareholder payments by S&P 500 firms flows to smaller public firms." Jesse M. Fried & Charles C.Y. Wang, *Are Buybacks Really Shortchanging Investment?*, Harv. Bus. Rev. (Mar.-Apr. 2018), https://hbr.org/2018/03/are-buybacks-really-shortchanging-investment. The study also reported that "a considerable portion of the net

shareholder payments by *all* public companies is reinvested in firms raising capital through IPOs and in nonpublic businesses backed by venture capital and private equity." *Id.* (emphasis added). Those firms employ nearly 70 percent of U.S. workers and generate nearly half of U.S. business profits. *Id.*

Another benefit of stock buybacks is that they allow companies to obtain shares that can be used for equity compensation without diluting existing share value. As one commenter on the proposed rule explained, "growth-stage and smaller companies . . . often compensate their employees with a higher proportion of their compensation as equity-based incentives." Allen & Stuckey Comment at 8. Buybacks help "reduce the dilutive effects" of such equity compensation plans, *id.*, by enabling companies to repurpose existing shares in lieu of creating new ones.

Buybacks also provide significant advantages over dividends—the other common way companies return excess cash to shareholders. For one thing, buybacks "can be tailored and modified far more efficiently and with less market disruption than dividend policies," Comment of Davis Polk & Wardwell LLP at 1, SEC File No. S7-21-21, *Share Repurchase Disclosure Modernization* (Mar. 28, 2022), https://

8

www.sec.gov/comments/s7-21-21/s72121-20121498-273485.pdf ("Davis Polk Comment"), because reducing dividends tends to "lead to a significant stock price fall," Edmans, *supra*; *see also id.* ("[I]ncreasing the ordinary dividend implicitly commits the firm to maintaining the higher dividend level in the future."). For another thing, many small companies simply don't have a predictable enough cash flow to pay regular dividends and thus rely on buybacks to return capital to shareholders. Allen & Stuckey Comment at 8; *see also* Comment of Gene Barr, Pa. Chamber of Bus. & Indus., at 3, SEC File No. S7-21-21, *Share Repurchase Disclosure Modernization* (Apr. 1, 2022), https://www.sec.gov/comments/s7-21-21/s72121-20122173-278209.pdf ("A large portion of issuers do not have the business model to make shareholder returns entirely or even partially via dividend and therefore rely on share repurchases as the sole method of shareholder return.").

Buybacks can also be a more tax-efficient method of returning cash to shareholders. Dividends typically are treated as ordinary income, and all shareholders who receive the dividend incur a tax liability. Lewis & White, *supra*, at 14. Profits from stock sales, by contrast, are treated as capital gains, which for most investors are taxed at a lower rate than

9

ordinary income. *Id.*; *see also* Investopedia, *Income Tax vs. Capital Gains Tax: Differences* (Jan. 12, 2023), https://www.investopedia.com/ask/ answers/052015/what-difference-between-income-tax-and-capital-gains-tax.asp. And only shareholders who sell back their shares incur a tax liability, even as all shareholders benefit from any increase in price. In this way, buybacks "allow shareholders to determine when they are exposed to personal taxes rather than imposing taxes on retail investors." Lewis & White, *supra*, at 14.

Finally, and relatedly, buybacks return cash to the shareholders who are most likely to put it to other productive uses. Because buybacks give shareholders the option to "*choose* whether to sell their shares back," those who sell "will likely only do so if they have alternative investment opportunities." Edmans, *supra*. Dividends, by contrast, "are paid out to all investors, even those who have no good alternative investment opportunities and who may indeed allow the cash to sit idle." *Id.*

In all these ways, stock buybacks benefit investors and the public at large, which profits from a healthy economy that efficiently allocates capital.

And these benefits extend to all types of investors, including retail investors and state pension and retirement funds. Retail investors account for over 20 percent of trading volume in U.S. stocks, Lewis & White, *supra*, at 3, so the benefits of increased shareholder returns, enhanced liquidity, and reduced market volatility apply directly to the millions of Americans who are retail investors.

As for state pension and retirement funds, as of 2017, of the top 1,000 retirement funds in the U.S., 198 were sponsored by state and local governments or other public entities, and those funds collectively held $4.25 trillion in assets. York, *supra*. That amount was 41 percent of *all* assets held by the 1,000 largest retirement funds. *Id.* So the benefits of buybacks described above plainly apply to state pension and retirement funds as well, and to the millions of beneficiaries of those funds.

According to a recent article in the *Yale Journal on Regulation*, "shareholders should prefer for [a] corporation to distribute rather than retain earnings if the corporation's after-tax rate of return is lower than the shareholder's after-tax rate of return." Daniel J. Hemel & Gregg D. Polsky, *Taxing Buybacks*, 38 Yale J. Reg. 246, 296 (2021). "That condition plausibly exists today for pension plans, tax-exempt institutions, and

individuals investing through tax-preferred retirement accounts—all of whom face a tax rate of zero on investment income." *Id.*

Stock buybacks are an effective way for companies to return excess cash to investors that provides a range of benefits. Perhaps most importantly, they help ensure capital is being put to productive uses, which benefits everyone—shareholder and non-shareholder alike. Of particular importance to *Amici* States, they benefit retail investors—the millions of everyday Americans who invest in the stock market—and the state pension and retirement funds millions more rely on for their retirement.

## II. By making stock buybacks a less attractive means of returning value to shareholders, the Final Rule will harm investors and the public at large.

As explained, stock buybacks benefit investors in a variety of ways. The Final Rule, however, imposes new requirements that will make buybacks a less attractive option for companies with excess cash. The likely result will be a reduction in economically beneficial buybacks as companies instead choose alternative options that generate less value for investors.

One way the Final Rule will make stock buybacks less attractive is through the rationale-disclosure requirement, which compels companies who repurchase shares to file a publicly available "narrative" that describes "[t]he objectives or rationales" for the buybacks and "the process or criteria used to determine the amount of repurchases." Final Rule at 36,056. As one commenter explained, this will require companies to disclose "significantly more detailed information about operational decision-making" and "[]cash management strategies" than is currently required, which "could create commercial, competitive, or other strategic harm." Allen & Stuckey Comment at 6. Companies also "may face the prospect of inadvertently disclosing sensitive information about planned M&A initiatives or other strategies before they are fully developed" or making disclosures that are "subject to change, which could create risk of litigation and have implications for the issuer's credibility." *Id.*

The Commission itself acknowledged the risks that accompany public disclosure of stock buyback strategies, including "the potential legal risk stemming from such disclosures, and the potential costs of leaking valuable private information to competitors that may infer proprietary information about the issuer." Final Rule at 36,036. But at

the very same time the Commission amplified those risks in the Final Rule by instructing that it expected companies, in their public narratives, to "discuss[] other possible ways to use the funds allocated for the repurchase" and "compar[e] the repurchases with other investment opportunities that would ordinarily be considered by the" company. *Id.* at 36,024. Those sorts of compelled disclosures easily could become a roadmap for a potential shareholder suit or a competitor seeking to undercut the company's position.

Another way the Final Rule will make buybacks less attractive for companies with excess cash is through the daily-data requirement, which compels companies to disclose detailed day-to-day information about buybacks—including the number of shares repurchased each day and average price per share—on a quarterly basis. *Id.* at 36,055. Disclosure of such granular data could lead to "unfounded speculation" about the reasons for variations in a company's day-to-day repurchase activity, such as the possibility that some "undisclosed event" or "nonpublic information" affected the company's strategy. Davis Polk Comment at 2.

The likely result of these new requirements will be a reduction in the amount of excess cash companies return to shareholders through

buybacks, as companies choose other options that do not carry the above-described risks. And because those other options will not have the same value-generating benefits as buybacks, the net result is likely to be an overall loss to investors and the economy.

The Final Rule admitted this very possibility, stating that the costs associated with the new disclosure requirements may "discourage" companies "from repurchases that would otherwise be optimal for shareholder value" and that such companies "may instead inefficiently overweigh dividends or reduce overall corporate payouts and inefficiently retain excess cash within the firm." Final Rule at 36,040 (citation omitted).

Numerous commenters seconded this concern. As one commenter explained, "[i]f issuers limit repurchase activity in response to the proposed reporting requirements, this would remove an important mechanism for returning capital to stockholders and liquidity in the issuer's stock could in many cases be reduced, causing increased volatility and risk for investors." Comment of Maria Ghazai, Bus. Roundtable, at 3, SEC File No. S7-21-21, *Share Repurchase Disclosure Modernization* (Apr.    1,    2022),    https://www.sec.gov/comments/s7-21-21/s72121-

20122223-278256.pdf. Another commenter warned that the proposed rule "could provide an incentive for companies to make sub-optimal investment decisions in an attempt to manage their cash balance" and that "such restrictions could also disincentivize investors from providing much-needed capital to the manufacturing sector." Comment of Chris Netram, Nat'l Ass'n of Mfrs., at 3, SEC File No. S7-21-21, *Share Repurchase Disclosure Modernization* (Apr. 1, 2022), https://www.sec.gov/comments/s7-21-21/s72121-20122035-275416.pdf.

These predictions are not speculation. To the contrary, as noted, the Commission itself acknowledged the added risks the Final Rule's disclosure requirements will impose on buyback programs. And the straight-line result of those added risks is likely to be a reduction in such programs, as companies seek other options that do not carry those same risks. Because buybacks benefit investors and the public at large, the overall effect will be reduced value for investors and a less efficient economy for all Americans.

## Conclusion

The Court should vacate the Final Rule, or at least its rationale-disclosure and daily-data requirements.

Respectfully submitted,


/s/ *Christopher A. Bates*
Christopher A. Bates
Deputy Solicitor General
Office of the Utah Attorney General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
(801) 538-9600
chrisbates@agutah.gov

*Counsel for Amici Curiae*

## Additional Counsel
*Counsel for* Amici *States*

STEVE MARSHALL
Attorney General
State of Alabama

TREG R. TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

JOHN M. FORMELLA
Attorney General
State of New Hampshire

DAVE YOST
Attorney General
State of Ohio

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

## Certificate of Compliance

This brief complies with the word limits of Federal Rule of Appellate Procedure 29(a)(5) because it contains 2,886 words, excluding items listed in Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point Century Schoolbook font.

/s/ *Christopher A. Bates*

## Certificate of Service

On July 17, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ *Christopher A. Bates*